22 Cal.3d 208 (1978)
583 P.2d 1281
149 Cal. Rptr. 239
AMADOR VALLEY JOINT UNION HIGH SCHOOL DISTRICT et al., Petitioners,
v.
STATE BOARD OF EQUALIZATION et al., Respondents. COUNTY OF ALAMEDA et al., Petitioners,
v.
STATE BOARD OF EQUALIZATION et al., Respondents. CITY AND COUNTY OF SAN FRANCISCO et al., Petitioners,
v.
JOSEPH E. TINNEY, as Tax Assessor, etc., et al., Respondents.
Docket Nos. S.F. 23849, 23850, 23855.
Supreme Court of California.
September 22, 1978.
*217 COUNSEL
William A. Norris, Stanley C. Fickle, Nancy E. Howard, Tuttle & Taylor, Edward J. Wallin, Keith V. Breon, Martha Buell Scott, Breon, Galgani & Godino, Larry J. Frierson, Ron Apperson, Ralph D. Stern, John J. Wagner, Wagner & Wagner, Richard C. Anthony, Frank J. Fekete, Peter J. Landsberger, John L. Bukey, Biddle, Walters & Bukey, John J. Hamlyn, Jr., Downey, Brand, Seymour & Rohwer, Richard J. Moore, *218 County Counsel, Kelvin H. Booty, Jr., James F. May, Adam Seth Ferber, John H. Cosier, Deputy County Counsel, Dawson Arnold, County Counsel, Frank J. De Marco, County Counsel, Robert A. Rehberg, County Counsel, George Agnost, City Attorney, Robert A. Kenealey, Assistant Chief Deputy City Attorney, Burk E. Delventhal, Margaret M. Heiser, Deputy City Attorneys, and Douglas Hickling, in pro. per., for Petitioners.
Evelle J. Younger, Attorney General, N. Eugene Hill, Chief Assistant Attorney General, John J. Klee, Jr., Assistant Attorney General, Clayton P. Roche, Edward P. Hollingshead, Jeffrey J. Fuller, Steven A. Merksamer and Marc B. Mihaly, Deputy Attorneys General, John H. Larson, County Counsel, Roger M. Whitby and Lawrence B. Launer, Deputy County Counsel, John B. Clausen, County Counsel, Daneen C. Flynn, Deputy County Counsel, Ralph B. Jordan, County Counsel, and D.N. Reid, Assistant County Counsel, for Respondents.
Van Bourg, Allen, Weinberg & Roger, Victor J. Van Bourg, Stewart Weinberg, Peter T. Galiano, Raymond L. Hansen, Penn Foote, Charles R. Gustafson, Robert H. Horn, Gene P. Gardiner, Ben H. Zuppan, Domingo R. Quintero, Michael S. Hegner, Graham A. Ritchie, David R. McEwen, John F. Powell, Thomas H. Crawford, Earl L. Bohachek, Rubenstein & Bohachek, John C. Wakefield, Ann Fagan Ginger, Ralph Santiago Abascal, Neil D. Eisenberg, Stanley E. Remelmeyer, City Attorney (Torrance), and Roger P. Freeman, Deputy City Attorney, as Amici Curiae.
OPINION
RICHARDSON, J.
In these consolidated cases, we consider multiple constitutional challenges to an initiative measure which was adopted by the voters of this state at the June 1978 primary election. This measure, designated on the ballot as Proposition 13 and commonly known as the Jarvis-Gann initiative, added article XIII A to the California Constitution. Its provisions are set forth in their entirety in the appendix to this opinion. (See post, at p. 257.) As will be seen, the new article changes the previous system of real property taxation and tax procedure by imposing important limitations upon the assessment and taxing powers of state and local governments.
*219 Petitioners, and the amici supporting them, are various governmental agencies and concerned citizens, each of whom has alleged actual or potential adverse effects resulting from the adoption and ultimate operation of the article. (Hereafter we refer jointly to all petitioners and their amici as petitioners, and refer to all respondents herein and those amici urging the validity of XIII A as respondents.) (1) The issues herein presented are of great public importance and should be resolved promptly. Under well settled principles petitioners, accordingly, have properly invoked the exercise of our original jurisdiction. (See California Housing Finance Agency v. Elliott (1976) 17 Cal.3d 575, 580 [131 Cal. Rptr. 361, 551 P.2d 1193]; County of Sacramento v. Hickman (1967) 66 Cal.2d 841, 845 [59 Cal. Rptr. 609, 428 P.2d 593].)
(2) We stress initially the limited nature of our inquiry. We do not consider or weigh the economic or social wisdom or general propriety of the initiative. Rather, our sole function is to evaluate article XIII A legally in the light of established constitutional standards. We further emphasize that we examine only those principal, fundamental challenges to the validity of article XIII A as a whole. In doing so we reaffirm and readopt an analytical technique previously used by us in adjudicating attacks upon similar enactments, in which "Analysis of the problems which may arise respecting the interpretation or application of particular provisions of the act should be deferred for future cases in which those provisions are more directly challenged." (County of Nevada v. MacMillen (1974) 11 Cal.3d 662, 666 [114 Cal. Rptr. 345, 522 P.2d 1345] [declaratory relief action to determine validity of the 1973 conflict of interest law, Gov. Code, § 3600 et seq.].) As will appear, we have concluded that, notwithstanding the existence of some unresolved uncertainties, as to which we reserve judgment, the article nevertheless survives each of the serious and substantial constitutional attacks made by petitioners.
(3) It is a fundamental precept of our law that, although the legislative power under our constitutional framework is firmly vested in the Legislature, "the people reserve to themselves the powers of initiative and referendum." (Cal. Const., art. IV, § 1.) It follows from this that, "`[the] power of initiative must be liberally construed ... to promote the democratic process.'" (San Diego Bldg. Contractors Assn. v. City Council (1974) 13 Cal.3d 205, 210, fn. 3 [118 Cal. Rptr. 146, 529 P.2d 570, 72 *220 A.L.R.3d 973] and cases cited; see Associated Home Builders etc., Inc. v. City of Livermore (1976) 18 Cal.3d 582, 591 [135 Cal. Rptr. 41, 557 P.2d 473].) Bearing in mind the foregoing interpretive aid, we briefly review the basic provisions of article XIII A. We caution that, save only as to the specific constitutional issues resolved, our summary description and interpretation of the article and of the implementing legislation and regulations do not preclude subsequent challenges to the specific meaning or validity of those enactments.
The new article contains four distinct elements. The first imposes a limitation on the tax rate applicable to real property: "The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property...." (§ 1, subd. (a).) (This limitation is made specifically inapplicable, under subd. (b), to property taxes or special assessments necessary to pay prior indebtedness approved by the voters.) The second is a restriction on the assessed value of real property. Section 2, subdivision (a), provides: "The full cash value means the County Assessors valuation of real property as shown on the 1975-76 tax bill under `full cash value,' or thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment...." Subdivision (b) permits a maximum 2 percent annual increase in "the fair market value base" of real property to reflect the inflationary rate.
The third feature limits the method of changes in state taxes: "From and after the effective date of this article, any changes in State taxes enacted for the purpose of increasing rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members ... of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed." (§ 3.) The fourth element is a restriction upon local taxes: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." (§ 4.) (The remaining sections relate to the effective dates (§ 5) and severability (§ 6) of the provisions of the new article.)
We examine petitioners' specific contentions.

*221 1. Constitutional Revision or Amendment

(4a) The petitioners' primary argument is that article XIII A represents such a drastic and far-reaching change in the nature and operation of our governmental structure that it must be considered a "revision" of the state Constitution rather than a mere "amendment" thereof. (5) As will appear, although the voters may accomplish an amendment by the initiative process, a constitutional revision may be adopted only after the convening of a constitutional convention and popular ratification or by legislative submission to the people. Because a revision may not be achieved through the initiative process, petitioners' first contention strikes at the very validity of article XIII A in its inception and in its entirety. Were we to conclude that the Proposition 13 initiative constituted a revision not an amendment, that would end our inquiry; the initiative would be invalid for its failure to meet the constitutional requirements of a revision.
The applicable constitutional provisions are specific. Article XVIII (entitled "Amending and Revising the Constitution") presently provides in full:
"SEC. 1. The Legislature by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, may propose an amendment or revision of the Constitution and in the same manner may amend or withdraw its proposal. Each amendment shall be so prepared and submitted that it can be voted on separately.
"SEC. 2. The Legislature by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, may submit at a general election the question whether to call a convention to revise the Constitution. If the majority vote yes on that question, within 6 months the Legislature shall provide for the convention. Delegates to a constitutional convention shall be voters elected from districts as nearly equal in population as may be practicable.
"SEC. 3. The electors may amend the Constitution by initiative.
"SEC. 4. A proposed amendment or revision shall be submitted to the electors and if approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise. If provisions of 2 or more measures approved at the same election conflict, those of the *222 measure receiving the highest affirmative vote shall prevail." (Italics added.)
We think it significant that prior to 1962 a constitutional revision could be accomplished only by the elaborate procedure of the convening of, and action by, a constitutional convention (art. XVIII, § 2). This fact suggests that the term "revision" in section XVIII originally was intended to refer to a substantial alteration of the entire Constitution, rather than to a less extensive change in one or more of its provisions. (6) Many years ago, in Livermore v. Waite (1894) 102 Cal. 113, 118-119 [36 P. 424], we described the fundamental distinction between revision and amendment as follows: "The very term `constitution' implies an instrument of a permanent and abiding nature, and the provisions contained therein for its revision indicate the will of the people that the underlying principles upon which it rests, as well as the substantial entirety of the instrument, shall be of a like permanent and abiding nature. On the other hand, the significance of the term `amendment' implies such an addition or change within the lines of the original instrument as will effect an improvement, or better carry out the purpose for which it was framed."
While the Constitution itself does not specifically distinguish between revision and amendment, we are considerably aided in an evaluation of petitioners' primary argument by our earlier analysis of the issue in McFadden v. Jordan (1948) 32 Cal.2d 330 [196 P.2d 787] (cert. den., 336 U.S. 918 [93 L.Ed. 1080, 69 S.Ct. 640]). In McFadden, we struck down an initiative measure which would have added 21,000 words to our then existing 55,000-word Constitution. We held that the initiative was "revisory rather than amendatory in nature," because of the "far reaching and multifarious substance of the measure ..." (p. 332) which dealt with such varied and diverse subjects as retirement pensions, gambling, taxes, oleomargarine, healing arts, civic centers, senate reapportionment, fish and game, and surface mining. We noted that the proposal would have repealed or substantially altered at least 15 of the 25 articles which then comprised the Constitution. (P. 345.)
We held in McFadden that the measure under scrutiny therein was clearly a revision, both because of its varied aspects and because of the "substantial curtail[ment]" of governmental functions which it would cause. (Pp. 345-346.) For example, one provision would have created a state pension commission with comprehensive governmental powers to be exercised by five named commissioners. We concluded that "The *223 delegation of far reaching and mixed powers to the commission, largely, if not almost entirely in effect, unchecked, places such commission substantially beyond the system of checks and balances which heretofore has characterized our governmental plan." (P. 348.)
In addition, although the subject of taxation was only one of many covered by the McFadden initiative, nevertheless we observe that the proposed taxation amendment would have accomplished, by itself, a far more substantial change in the state's taxation scheme than that effected by Proposition 13. The far reaching nature of the McFadden measure is demonstrated by the fact that it not only would have destroyed the power of cities and counties to tax and regulate their own budgets and expenditures (p. 344), but also the 2 percent gross receipts tax proposed therein was to have been the only tax permitted to any agency on real or personal property, or on any business enterprises. (Pp. 336-337.)
Finally, we stressed in McFadden that "The proposal is offered as a single amendment but it obviously is multifarious. It does not give the people an opportunity to express approval or disapproval severally as to each major change suggested; rather does it, apparently, have the purpose of aggregating for the measure the favorable votes from electors of many suasions who, wanting strongly enough any one or more propositions offered, might grasp at that which they want, tacitly accepting the remainder. Minorities favoring each proposition severally might, thus aggregated, adopt all. Such an appeal might well be proper in voting on a revised constitution, proposed under the safeguards provided for such a procedure, but it goes beyond the legitimate scope of a single amendatory article." (P. 346, italics in original.)
(7) Taken together our Livermore and McFadden decisions mandate that our analysis in determining whether a particular constitutional enactment is a revision or an amendment must be both quantitative and qualitative in nature. For example, an enactment which is so extensive in its provisions as to change directly the "substantial entirety" of the Constitution by the deletion or alteration of numerous existing provisions may well constitute a revision thereof. However, even a relatively simple enactment may accomplish such far reaching changes in the nature of our basic governmental plan as to amount to a revision also. In illustration, the parties herein appear to agree that an enactment which purported to vest all judicial power in the Legislature would amount to a revision without regard either to the length or complexity of the measure or the number of existing articles or sections affected by such change.
*224 (4b) In both its quantitative and qualitative aspects, however, article XIII A appears demonstrably less sweeping than the initiative measure at issue in McFadden. As noted above, the McFadden measure consisted of 21,000 words and covered many different subjects, whereas XIII A comprises approximately 400 words and, as we discuss more fully below, is limited to the single subject of taxation (with particular emphasis upon real property taxation). Although petitioners suggest that 8 articles and 37 sections of the existing Constitution may be affected by the new article, our analysis suggests that the article's quantitative effect is less extensive.
Our review of petitioners' description of numerous asserted changes indicates that the claims may be based upon possible errors in petitioners' interpretation of the new article. For example, they argue that at least three constitutional articles will be modified by the new requirement that the available real property tax revenues be apportioned "to the districts within the counties" (§ 1, subd. (a), italics added), thereby excluding those districts which encompass more than a single county. However, implementing legislation has included such multi-county districts within the tax allocation scheme. (See Gov. Code, § 26912, subd. (d).) In addition, petitioners assume that article XIII A will annul or amend the various "home rule" provisions of the state Constitution (art. XI, §§ 3-7), an assumption we discuss and reject below. Finally, we note that the majority of those changes emphasized by petitioners pertain to a single existing constitutional provision, article XIII, which already contains 33 separate sections dealing with the subject of taxation and assessment procedure. Since article XIII doubtless was premised upon the assumption that local taxation would be unrestricted by any tax rate and assessment limitations such as those adopted by XIII A, it is not surprising that many of these sections may be said to be affected by the new taxation scheme. Nevertheless, we decline to hold that article XIII A accomplished a revision of the Constitution by reason of its quantitative effect upon the existing provisions of that document.
Petitioners insist, however, that the new article also will have far reaching qualitative effects upon our basic governmental plan, in two principal particulars, namely, (1) the loss of "home rule" and (2) the conversion of our governmental framework from "republican" to "democratic" form. A close analysis of XIII A convinces us that its probable effects are not as fundamentally disruptive as petitioners suggest.
a.) Loss of home rule. (8) The principle of home rule involves, essentially, the ability of local government (technically, chartered cities, *225 counties, and cities and counties) to control and finance local affairs without undue interference by the Legislature. (See, e.g., Weekes v. City of Oakland (1978) 21 Cal.3d 386, 399-400 [conc. opn.], 422-426 [dis. opn.] [146 Cal. Rptr. 558, 579 P.2d 449], and authorities cited; Bishop v. City of San Jose (1969) 1 Cal.3d 56, 61-63 [81 Cal. Rptr. 465, 460 P.2d 137].) (4c) It is undeniably true that a constitutional limitation upon prevailing local taxation rates and assessments will have a potentially limiting effect upon the management and resolution of local affairs. Reduced taxes may be expected to generate reduced revenues, inevitably resulting in a corresponding curtailment of locally financed services and programs. To conclude, however, that the mere imposition of tax limitations, per se, accomplishes a constitutional revision would in effect bar the people from ever achieving any local tax relief through the initiative process. Petitioners have cited to us no authorities which support such a broad proposition, and our own research, disclosing only one case, indicates a contrary rule. (See School Dist. of City of Pontiac v. City of Pontiac (1933) 262 Mich. 338 [247 N.W. 474, 477] [initiative measure adopting a 1 1/2 percent tax limitation on assessed value, and requiring two-thirds approval of electorate to increase taxes, was a constitutional amendment, not a revision].)
Petitioners insist, however, that article XIII A has an additional effect beyond the mere limitation of tax revenues, namely, the vesting in the Legislature of the power to allocate to local governmental agencies the revenues derived from real property taxation. It is suggested that, by reason of the operation of section 1, subdivision (a), of article XIII A (allocating the revenues from the 1 percent maximum tax "according to law"), the Legislature is thereby empowered, at its whim, and upon whatever conditions it may impose, to pick and choose among the local agencies, rewarding "deserving" agencies with substantial amounts while penalizing others by reduced awards. Certainly nothing on the face of the article, however, abrogates home rule to this extent, or discloses any intent to undermine or subordinate preexisting constitutional provisions on that subject (Cal. Const., art. XI, §§ 3-7). Indeed, present legislative implementation of article XIII A reveals that such a result has not ensued. For several reasons, petitioners' fears in this connection seem illusory and ill-founded.
First, it is clear that even prior to the adoption of article XIII A, the Constitution authorized the Legislature to "provide maximum property tax rates and bonding limits for local government" (art. XIII, § 20), to *226 provide similar limits for school districts (id., § 21), and to grant exemptions from real property taxation in favor of certain specified classes of property (id., § 4). Thus, from the standpoint of legislative control, the new article appears potentially no more threatening to home rule than these preexisting constitutional limitations.
Second, wholly unlike the McFadden initiative, article XIII A neither destroys nor annuls the taxing power of local agencies. Although revenues derived from real property taxes may well be substantially reduced by reason of the new tax rate and assessment restrictions (§§ 1, 2), local agencies retain full authority to impose "special taxes" (other than certain real property taxes) if approved by a two-thirds vote of the "qualified electors." (§ 4.) Although the interpretation of the foregoing quoted provisions is not presently before us, it seems evident that section 4 assists in preserving home rule principles by leaving to local voters the decision whether or not to authorize "special" taxes to support local programs.
Third, article XIII A does not by its terms empower the Legislature to direct or control local budgetary decisions or program or service priorities, and we have no reason to assume that the Legislature will attempt to exercise its powers in such a manner as to interfere with local decision-making. Certainly, local agencies retain the same constitutional and statutory authority over municipal affairs which they possessed and exercised prior to the adoption of the new article. The mere fact of reduction in local revenues does not lead us necessarily to the conclusion that local agencies have forfeited control over allocations and disbursements of their remaining funds.
Finally, recent implementing legislation (Stats. 1978, chs. 292, 332) confirms the Legislature's present intention to preserve home rule and local autonomy respecting the allocation and expenditure of real property tax revenues. Although this legislation is, of course, subject to future change and, accordingly, is not conclusive on the point, the present pattern of legislative implementation of article XIII A appears to refute petitioners' premise that the article necessarily and inevitably has resulted or will result in the loss of home rule. Among other provisions, the Legislature has enacted Government Code section 26912 which contains the formulae whereby county auditors must allocate to various local agencies and school districts within county boundaries the revenues to be derived from the 1 percent maximum real property tax during the fiscal *227 year 1978-1979. Although these formulae are somewhat complex, in general they aim at allocating these funds on a pro rata basis, without imposing any condition whatever regarding their ultimate use. Each "local agency" (city, county, city and county, and special district) is to receive a proportionate share based upon its average property tax revenues during the previous three fiscal years. (Gov. Code, § 26912, subds. (a), (b)(1).) Similarly, each school district, county superintendent of schools, and community college district, is to receive a proportionate share based upon the entity's average property tax revenues for the 1977-1978 fiscal year. (Id., subd. (b)(2).)
The foregoing tax allocation scheme is evidently intended to assure that each local agency and school district will receive approximately the same percentage of the total tax revenues as it had previously received. Thus, contrary to petitioners' fears and assumptions, the adoption of XIII A need not necessarily result either in abrogation of home rule in this state or in the delegation to the Legislature of the power to make those revenue and budgetary decisions formerly left to local discretion and control. (Other sections of the new legislation contain formulae for allocating the state's surplus tax funds. These provisions do not relate to the distribution of revenues from real property taxation and, accordingly, they are not relevant to our present discussion, except insofar as the availability of these funds may minimize the impact of the reduction in local tax revenues.)
b.) Loss of republican form of government. Continuing their thesis that XIII A is a constitutional revision not an amendment under our McFadden holding, petitioners next maintain that the operation of the article, and particularly section 4 thereof, will result in a change from a "republican" form of government (i.e., lawmaking by elected representatives) to a "democratic" governmental plan (i.e., lawmaking directly by the people).
Contrary to petitioners' assertion, however, we are convinced that article XIII A is more modest both in concept and effect and does not change our basic governmental plan. Following the adoption of article XIII A both local and state government will continue to function through the traditional system of elected representation. Other than in the limited area of taxation, the authority of local government to enact appropriate laws and regulations remains wholly unimpaired. The requirement of section 4 that any "special taxes" must be approved by a two-thirds vote of the "qualified electors" restricts but does not abolish the power of local *228 governments in the raising of revenue. We decline to hold that such a "super-majority" requirement, the two-thirds vote, standing alone and limited to the subject of taxes, constitutes a substantial constitutional revision which cannot be accomplished through an initiative. Similar voting requirements in financial matters have not been uncommon. For example, prior to the adoption of article XIII A, our Constitution required the assent of two-thirds of the qualified electors to incur indebtedness exceeding in any year the income and revenue provided for that year. (Art. XVI, § 18.) We have, within another context, previously described other examples of constitutional provisions sanctioning deviations from simple "majority rule." (See Westbrook v. Mihaly (1970) 2 Cal.3d 765, 797-798, fn. 64 [87 Cal. Rptr. 839, 471 P.2d 487].)
It should be borne in mind that notwithstanding our continuing representative and republican form of government, the initiative process itself adds an important element of direct, active, democratic contribution by the people. (See In re Pfahler (1906) 150 Cal. 71, 77-78 [88 P. 270] [holding that the constitutional guarantee of a republican form of government is inapplicable to the local governmental level].) We thus conclude that section 4 of article XIII A, and its requirement of substantial popular support, beyond that of a bare majority for the approval and adoption of "special" local taxes adds nothing novel to the existing governmental framework of this state.
In summary, we believe that it is apparent that article XIII A will result in various substantial changes in the operation of the former system of taxation. Yet, unlike the alterations effected by the McFadden initiative discussed above, the article XIII A changes operate functionally within a relatively narrow range to accomplish a new system of taxation which may provide substantial tax relief for our citizens. We decline to hold that such a limited purpose cannot be achieved directly by the people through the initiative process. As succinctly and graphically expressed a number of years ago in a study of the California procedure, "... the initiative is in essence a legislative battering ram which may be used to tear through the exasperating tangle of the traditional legislative procedure and strike directly toward the desired end. Virtually every type of interest-group has on occasion used this instrument. It is deficient as a means of legislation in that it permits very little balancing of interests or compromise, but it was designed primarily for use in situations where the ordinary machinery of legislation had utterly failed in this respect. It has served, with varying degrees of efficacy, as a vehicle for the advocacy of action *229 ultimately undertaken by the representative body." (Key & Crouch, The Initiative and the Referendum in Cal. (1939) p. 485, italics added.)
The foregoing language, written almost 40 years ago, seems remarkably prophetic given the apparent historic origins of article XIII A. Although we express neither approval nor disapproval of the article from the standpoint of sound fiscal or social policy, we find nothing in the Constitution's revision and amendment provisions (art. XVIII) which would prevent the people of this state from exercising their will in the manner herein accomplished. Indeed, if the foregoing description of the initiative as a "legislative battering ram" is accurate it would seem anomalous to insist, as petitioners in effect do, that the sovereign people cannot themselves act directly to adopt tax relief measures of this kind, but instead must defer to the Legislature, their own representatives. We conclude that article XIII A fairly may be deemed a constitutional amendment, not a revision.

2. The Single-subject Requirement

(9a) Our Constitution provides that "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." (Art. II, § 8, subd. (d).) (10a) Acknowledging that its general reference is to the subject of taxation, petitioners nonetheless argue that article XIII A covers many subjects and, indeed, is so sweeping and extensive in its practical effect and import as to encompass nearly the entirety of "government." In this regard, their argument is somewhat related to their prior contention that article XIII A constitutes a revision of the Constitution, rather than an amendment. Accordingly, many of our previous observations regarding the revision and amendment procedures have application to their one-subject assertions.
The single-subject requirement of article II was adopted in 1948, possibly in response to the many-faceted initiative measure which we invalidated in McFadden, supra. Only a year later, in Perry v. Jordan (1949) 34 Cal.2d 87 [207 P.2d 47], we had occasion to construe the new constitutional provision. In Perry, we adopted and applied the "reasonably germane" test previously developed by earlier decisions construing a similar single-subject restriction applicable to legislation (see Cal. Const., art. IV, § 9). We quoted with approval the following language from an earlier opinion in which we had upheld the legislative adoption of the Probate Code in a single enactment: "... [W]e are of the view that the [single-subject] provision is not to receive a narrow or technical construction *230 in all cases, but is to be construed liberally to uphold proper legislation, all parts of which are reasonably germane. [Citation.] The provision was not enacted to provide means for the overthrow of legitimate legislation. [Citation.] [¶] Numerous provisions, having one general object, if fairly indicated in the title, may be united in one act. Provisions governing projects so related and interdependent as to constitute a single scheme may be properly included within a single act. [Citation.] The legislature may insert in a single act all legislation germane to the general subject as expressed in its title and within the field of legislation suggested thereby. [Citation.] ... A provision which conduces to the act, or which is auxiliary to and promotive of its main purpose, or has a necessary and natural connection with such purpose is germane within the rule...." (Evans v. Superior Court (1932) 215 Cal. 58, 62-63 [8 P.2d 467], italics added.)
In Perry, the challenged initiative measure had as its general subject the repeal of constitutional provisions governing aid to the aged and blind. We noted that the repeal measure would have several collateral effects, including (1) vesting the Legislature with power to reduce pension payments, (2) giving the counties the responsibility of administering pension programs, (3) imposing on relatives liability for benefits, and (4) raising the minimum age qualification for benefits. (Perry v. Jordan, supra, 34 Cal.2d at pp. 93-94.) Nonetheless, and referring to the foregoing features of the initiative, we unanimously rejected the single-subject challenge, observing that "All those things obviously pertain to any plan  single subject  of aid to the needy aged and blind. They are merely administrative details." (Id., at p. 94.)
(9b) We thus draw from Perry its primary lesson that an initiative measure will not violate the single-subject requirement if, despite its varied collateral effects, all of its parts are "reasonably germane" to each other. We note also the existence of a more restrictive test recently proposed in the dissenting opinion of Justice Manuel in Schmitz v. Younger (1978) 21 Cal.3d 90, 100 [145 Cal. Rptr. 517, 577 P.2d 652], wherein he suggested that "an initiative's provisions must be functionally related in furtherance of a common underlying purpose." (10b) Our analysis of article XIII A convinces us that the several elements of that article satisfy either standard in that they are both reasonably germane to, and functionally related in furtherance of, a common underlying purpose, namely, effective real property tax relief.
*231 As previously noted, article XIII A consists of four major elements, a real property tax rate limitation (§ 1), a real property assessment limitation (§ 2), a restriction on state taxes (§ 3), and a restriction on local taxes (§ 4). Although petitioners insist that these four features constitute separate subjects, we find that each of them is reasonably interrelated and interdependent, forming an interlocking "package" deemed necessary by the initiative's framers to assure effective real property tax relief. Since the total real property tax is a function of both rate and assessment, sections 1 and 2 unite to assure that both variables in the property tax equation are subject to control. Moreover, since any tax savings resulting from the operation of sections 1 and 2 could be withdrawn or depleted by additional or increased state or local levies of other than property taxes, sections 3 and 4 combine to place restrictions upon the imposition of such taxes. Although sections 3 and 4 do not pertain solely to the matter of property taxation, both sections, in combination with sections 1 and 2, are reasonably germane, and functionally related, to the general subject of property tax relief.
(11) Among other purposes, the single-subject requirement was enacted to minimize the risk of voter confusion and deception. (Schmitz v. Younger, supra, 21 Cal.3d 90, 97 [dis. opn.].) (10c) We may take judicial notice of the fact that the advance publicity and public discussion of article XIII A and its predicted effects were massive. (Evid. Code, § 452, subd. (g).) The measure received as much public attention as any other ballot proposition in recent years. These circumstances would seem to dilute the risk of voter confusion or deception by reason of the inclusion of the four principal features of the article in one ballot proposition. Moreover, the official voters pamphlet mailed to all registered voters contained an elaborate and detailed explanation of the various elements of Proposition 13. (See Morris v. Priest (1971) 14 Cal. App.3d 621, 625 [92 Cal. Rptr. 476].)
Petitioners contend, however, that adoption of XIII A violated a second important purpose underlying the single-subject requirement, namely, to avoid "exploiting" the initiative process by combining in a single measure several provisions which might not have commanded majority support if considered separately. (See McFadden v. Jordan, supra, 32 Cal.2d 330, 346.) Petitioners rely upon cases from several other jurisdictions expressing this principle. For example, in Kerby v. Luhrs (1934) 44 Ariz. 208 [36 P.2d 549], the court struck down an initiative measure which would have added to the Arizona Constitution such diverse provisions as (1) a new tax on copper production, (2) a new method of valuing public utility *232 property, and (3) a new state tax commission. According to the court in Kerby, any of these provisions, singly, could have been adopted "without the slightest need of adopting" the others. (P. 554.) Although each provision related to the general subject of "taxation," the Kerby court found no other connection between them, characterizing the measure as "logrolling of the worst type...." (P. 555.)
Unlike the enactment condemned in Kerby, however, the four elements of article XIII A not only pertain to the general subject of taxation, but also are reasonably interdependent and functionally related to each other. More importantly, no apparent "logrolling" is involved in this case. Each of the four basic elements of article XIII A was designed to interlock with the others to assure an effective tax relief program.
Petitioners assert that each of the four separate elements of article XIII A might not have been approved had each element appeared separately on the ballot. They speculate that various classes of voters may have favored some, but not all, of these elements; petitioners would require a showing that each of the several provisions of an initiative measure is capable of gaining approval by the electorate, independent of the other provisions. We are unable to accept such a contention, concluding that petitioners' proposed single-subject test is far too strict, and lacks support in the authorities. Aside from the obvious difficulty of ever establishing satisfactorily such "independent voter approval," this standard would defeat many legitimate enactments containing isolated, arguably "unpopular," provisions reasonably deemed necessary to the integrated functioning of the enactment as a whole. We avoid an overly strict judicial application of the single-subject requirement, for to do so could well frustrate legitimate efforts by the people to accomplish integrated reform measures. As we have previously observed, the initiative procedure itself was specifically intended to accomplish such kinds of reforms through its function as a "legislative battering ram." We should dull or blunt its force only for reasons that are constitutionally mandated, and accordingly we conclude that article XIII A does not violate the single-subject requirement of article II.

3. Equal Protection of the Laws

Petitioners' equal protection argument against article XIII A is directed at two aspects of the article. They contend that (1) the "rollback" of assessed valuation (§ 2, subd. (a)) assertedly will result in invidious discrimination between owners of similarly situated property, and that (2) *233 the two-third voting requirement for enacting "special taxes" by local agencies (§ 4) unduly discriminates in favor of those voters casting negative votes. As will appear, we hold that neither contention has merit.
a.) 1975-1976 Assessment Date. (12a) As we have noted, section 2, subdivision (a), of article XIII A provides that "The full cash value [to which the 1 percent maximum tax applies] means the County Assessors valuation of real property as shown on the 1975-76 tax bill under `full cash value,' or thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-76 tax levels may be reassessed to reflect that valuation." (§ 2, subd. (b), permits an annual 2 percent maximum increase on the "fair market value base" of property, to reflect the inflationary rate.) Petitioners emphasize that, by reason of the "rollback" of assessed value to the 1975-1976 fiscal year, two substantially identical homes, located "side-by-side" and receiving identical governmental services, could be assessed and taxed at different levels depending upon their date of acquisition. Such a disparity in tax treatment, petitioners claim, constitutes an arbitrary discrimination in violation of the federal equal protection clause (Amend. XIV, § 1).
Preliminarily, we note that petitioners' equal protection challenge, arguably, is premature. (13) As a general rule, courts will not reach constitutional questions "unless absolutely necessary to a disposition" of the case before them (Bayside Timber Co. v. Board of Supervisors (1971) 20 Cal. App.3d 1, 5-6 [97 Cal. Rptr. 431]), and we could decline to consider the issue in the abstract and instead await its resolution within the framework of an actual controversy wherein the disparity is pivotal.
(12b) Nevertheless, we have elected to treat the equal protection issue as constituting an attack upon the face of the article itself, because the assessors throughout this state must be advised whether to follow the new assessment procedure. As will appear, we will conclude that the essential demands of equal protection are satisfied by a rational basis underlying section 2 of the new article.
(14a) The general principles applicable to the determination of an equal protection challenge to state tax legislation were recently summarized by the United States Supreme Court as follows: "We have long held that `[w]here taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in *234 making classifications and drawing lines which in their judgment produce reasonable systems of taxation.' [Citation.] (15a) A state tax law is not arbitrary although it `discriminate[s] in favor of a certain class ... if the discrimination is founded upon a reasonable distinction, or difference in state policy,' not in conflict with the Federal Constitution. [Citation.] This principle has weathered nearly a century of Supreme Court adjudication...." (Kahn v. Shevin (1974) 416 U.S. 351, 355-356 [40 L.Ed.2d 189, 193, 94 S.Ct. 1734].)
(14b) Consistent with the foregoing expression of broad liberality, the high court has recognized the wide flexibility permitted states in the enforcement and interpretation of their tax laws, holding that "The latitude of discretion is notably wide in the classification of property for purposes of taxation and the granting of partial or total exemptions upon grounds of policy." (Royster Guano Co. v. Virginia (1920) 253 U.S. 412, 415 [64 L.Ed. 989, 991, 40 S.Ct. 560], italics added; see Haman v. County of Humboldt (1973) 8 Cal.3d 922, 925-927 [106 Cal. Rptr. 617, 506 P.2d 993].) There exists no "iron rule of equality, prohibiting the flexibility and variety that are appropriate" to schemes of taxation. (Allied Stores of Ohio v. Bowers (1959) 358 U.S. 522, 526 [3 L.Ed.2d 480, 484, 79 S.Ct. 437]; see Tax Commissioners v. Jackson (1931) 283 U.S. 527, 537 [75 L.Ed. 1248, 1255-1256, 51 S.Ct. 540, 73 A.L.R. 1464]; Ohio Oil Co. v. Conway (1930) 281 U.S. 146, 159 [74 L.Ed. 775, 781-782, 50 S.Ct. 310].) (15b) So long as a system of taxation is supported by a rational basis, and is not palpably arbitrary, it will be upheld despite the absence of "`a precise, scientific uniformity'" of taxation. (Kahn v. Shevin, supra, 416 U.S. at p. 356, fn. 10 [40 L.Ed.2d at pp. 193-194]; Allied Stores of Ohio, supra, at p. 527 [3 L.Ed.2d at p. 485]; Ohio Oil Co., supra, at pp. 159-160 [74 L.Ed. at pp. 781-783]; see Franklin Life Ins. Co. v. State Board of Equalization (1965) 63 Cal.2d 222, 232-233 [45 Cal. Rptr. 869, 404 P.2d 477].)
(12c) Petitioners, in response, rely upon a line of cases which hold, as a general proposition, that the intentional, systematic undervaluation of property similarly situated with other property assessed at its full value constitutes an improper discrimination in violation of equal protection principles. (E.g., Cumberland Coal Co. v. Board (1931) 284 U.S. 23, 28 [76 L.Ed. 146, 149-150, 52 S.Ct. 48]; Sioux City Bridge v. Dakota County (1923) 260 U.S. 441, 445 [67 L.Ed. 340, 342-343, 43 S.Ct. 190, 28 A.L.R. 979]; see Hillsborough v. Cromwell (1946) 326 U.S. 620, 623 [90 L.Ed. 358, 363, 66 S.Ct. 445] [equal protection forbids imposing taxes not levied against persons of the same class].)
*235 The foregoing cases, however, involved constitutional or statutory provisions which mandated the taxation of property on a current value basis. These cases do not purport to confine the states to a current value system under equal protection principles or to state an exception to the general rule accepted both by the United States Supreme Court and by us, as previously noted, that a tax classification or disparity of tax treatment will be sustained so long as it is founded upon some reasonable distinction or rational basis.
By reason of section 2, subdivision (a), of the article, except for property acquired prior to 1975, henceforth all real property will be assessed and taxed at its value at date of acquisition rather than at current value (subject, of course, to the 2 percent maximum annual inflationary increase provided for in subdivision (b)). This "acquisition value" approach to taxation finds reasonable support in a theory that the annual taxes which a property owner must pay should bear some rational relationship to the original cost of the property, rather than relate to an unforeseen, perhaps unduly inflated, current value. Not only does an acquisition value system enable each property owner to estimate with some assurance his future tax liability, but also the system may operate on a fairer basis than a current value approach. For example, a taxpayer who acquired his property for $40,000 in 1975 henceforth will be assessed and taxed on the basis of that cost (assuming it represented the then fair market value). This result is fair and equitable in that his future taxes may be said reasonably to reflect the price he was originally willing and able to pay for his property, rather than an inflated value fixed, after acquisition, in part on the basis of sales to third parties over which sales he can exercise no control. On the other hand, a person who paid $80,000 for similar property in 1977 is henceforth assessed and taxed at a higher level which reflects, again, the price he was willing and able to pay for that property. Seen in this light, and contrary to petitioners' assumption, section 2 does not unduly discriminate against persons who acquired their property after 1975, for those persons are assessed and taxed in precisely the same manner as those who purchased in 1975, namely, on an acquisition value basis predicated on the owner's free and voluntary acts of purchase. This is an arguably reasonable basis for assessment. (We leave open for future resolution questions regarding the proper application of art. XIII A to involuntary changes in ownership or new construction.)
In addition, the fact that two taxpayers may pay different taxes on substantially identical property is not wholly novel to our general taxation *236 scheme. For example, the computation of a sales tax on two identical items of personalty may vary substantially, depending upon the exact sales price and the availability of a discount. Article XIII A introduces a roughly comparable tax system with respect to real property, whereby the taxes one pays are closely related to the acquisition value of the property.
In converting from a current value method to an acquisition value system, the framers of article XIII A chose not to "roll back" assessments any earlier than the 1975-1976 fiscal year. For assessment purposes, persons who acquired property prior to 1975 are deemed to have purchased it during 1975. These persons, however, cannot complain of any unfair tax treatment in view of the substantial tax advantage they will reap from a return of their assessments from current to 1975-1976 valuation levels. Indeed, the adoption of a uniform acquisition value system without some "cut off" date reasonably might have been considered both administratively unfeasible and incapable of producing adequate tax revenues. The selection of the 1975-1976 fiscal year as a base year, although seemingly arbitrary, may be considered as comparable to utilization of a "grandfather" clause wherein a particular year is chosen as the effective date of new legislation, in order to prevent inequitable results or to promote some other legitimate purpose. (See Harris v. Alcoholic Bev. etc. Appeals Bd. (1964) 61 Cal.2d 305, 309-310 [38 Cal. Rptr. 409, 392 P.2d 1].) Similar provisions are routinely upheld by the courts. (See, e.g., New Orleans v. Dukes (1976) 427 U.S. 297, 305-306 [49 L.Ed.2d 511, 517-519, 96 S.Ct. 2513]; In re Norwalk Call (1964) 62 Cal.2d 185, 188 [41 Cal. Rptr. 666, 397 P.2d 426].)
Petitioners insist, however, that property of equal current value must be taxed equally, regardless of its original cost. This proposition is demonstrably without legal merit, for our state Constitution itself expressly contemplates the use of "a value standard other than fair market value...." (Art. XIII, § 1, subd. (a).) Moreover, the Legislature is empowered to grant total or partial exemptions from property taxation on behalf of various classes (e.g., veterans, blind or disabled persons, religious, hospital or charitable property; see art. XIII, § 4), despite the fact that similarly situated property may be taxed at its full value. In addition, homeowners receive a partial exemption from taxation (art. XIII, § 3, subd. (k)) which is unavailable to other property owners. As noted previously, the state has wide discretion to grant such exemptions. (Royster Guano Co. v. Virginia, supra, 253 U.S. 412, 415 [64 L.Ed. 989, 991].)
*237 Finally, no compelling reason exists for assuming that property lawfully may be taxed only at current values, rather than at some other value, or upon some different basis. (16) As the United States Supreme Court has explained, "The State is not limited to ad valorem taxation. It may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. In levying such taxes, the State is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value." (Ohio Oil Co. v. Conway, supra, 281 U.S. 146, 159 [74 L.Ed. 775, 782].) (12d) We cannot say that the acquisition value approach incorporated in article XIII A, by which a property owner's tax liability bears a reasonable relation to his costs of acquisition, is wholly arbitrary or irrational. Accordingly, the measure under scrutiny herein meets the demands of equal protection principles.
b.) Two-thirds Voting Requirement. (17) Petitioners have also questioned whether the requirement of a two-thirds vote to approve "special" local taxes (§ 4) denies to voters the equal protection of the laws. We may quickly dispose of the contention. Petitioners rely upon our decision in Westbrook v. Mihaly, supra, 2 Cal.3d 765, wherein we held that a two-thirds requirement for approval of county general obligation bonds violated federal equal protection principles. However, our Westbrook opinion was vacated by the United States Supreme Court (Mihaly v. Westbrook (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224]) and the cause was remanded for our reconsideration in the light of Gordon v. Lance (1971) 403 U.S. 1 [29 L.Ed.2d 273, 91 S.Ct. 1889], a case which upheld a 60 percent vote requirement primarily because no "discrete and insular minority" was singled out for special treatment by application of the voting requirement. Thus, Westbrook no longer represents the controlling law on the subject. (See Coffineau v. Eu (1977) 68 Cal. App.3d 138, 143 [137 Cal. Rptr. 90].) Because persons who vote in favor of tax measures may not be deemed to represent a definite, identifiable class, equal protection principles do not forbid "debasing" their vote by requiring a two-thirds approval of such measures.

4. Right to Travel

(18a) Petitioners insist that the constitutional right to travel (see Associated Home Builders etc., Inc. v. City of Livermore, supra, 18 Cal.3d 582, 602) is impaired by the provisions of article XIII A. They reason that since any "nonresidents or newly arrived residents" will have to pay greater property taxes than "established" residents article XIII A will *238 deter property owners from moving to another location, thereby inhibiting travel.
As we have explained in discussing petitioners' equal protection challenge, no penalty is imposed on the owner. (19) The change from a current value system to an acquisition value method is intended to benefit all property owners, past and future, resident and nonresident, by reducing inflationary increases in assessments, by limiting tax rates, and by permitting the taxpayer to make more careful and accurate predictions of future tax liability. (18b) Under the former system, it was arguable that prospective purchasers of real property might have been deterred from purchasing (thereby impairing their right to travel) by reason of the unpredictable nature of future property tax liability resulting from unlimited inflationary pressures. Certainly, travel is inhibited to no greater extent by the new system, which establishes a more fixed and stable measure than that imposed by the former system of unconstrained property taxation based on current values. Accordingly, we hold that the right to travel is not unconstitutionally impaired by article XIII A.

5. Impairment of Contracts

(20) Petitioners forcefully argue that the operation of article XIII A inevitably will result in the default of various contractual obligations which were incurred by local agencies and districts prior to the enactment of the new article. At the least, petitioners contend, the new restrictions upon the local tax power will "depreciate" the security on which the various obligees have relied for repayment of public obligations held by them. It is claimed, therefore, that article XIII A constitutes an unlawful impairment of contract under the federal Constitution (art. I, § 10, cl. 1).
Petitioners observe that section 1, subdivision (b), of article XIII A, in apparent anticipation of the argument, contains a specific exception in favor of those holding evidence of certain prior indebtedness: "The limitation provided for in subdivision (a) [the 1 percent maximum tax] shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective." (Italics added.) Petitioners point, however, to certain municipal obligations which were not required to be approved by the voters, including pension and health plan benefits, labor and other municipal contracts, and redevelopment agency bonds. The latter category, particularly, involves a special risk of *239 impairment, according to petitioners, for redevelopment agencies rely exclusively upon property tax revenues for the retirement of their bonds.
Redevelopment bonds are secured by a pledge of so-called "tax increment" revenues generated by increases in the assessed value of the redeveloped property. (Cal. Const., art. XVI, § 16; Health & Saf. Code, §§ 33670, 33671; see Redevelopment Agency v. County of San Bernardino (1978) 21 Cal.3d 255, 257-259 [145 Cal. Rptr. 886, 578 P.2d 133].) As we explained in San Bernardino, "In essence this section [art. XVI, § 16] provides that if, after a redevelopment project has been approved, the assessed valuation of taxable property in the project increases, the taxes levied on such property in the project area are divided between the taxing agency and the redevelopment agency. The taxing agency receives the same amount of money it would have realized under the assessed valuation existing at the time the project was approved, while the additional money resulting from the rise in assessed valuation is placed in a special fund for repayment of indebtedness incurred in financing the project." (Id., at p. 259, italics omitted.)
According to petitioners, article XIII A will have a dual adverse effect upon redevelopment agency revenues because both the 1 percent maximum tax and the "rollback" of assessments to a 1975-1976 valuation will combine to reduce substantially tax increment revenues. It is further contended that the problem thereby posed is acute, and the implications widespread. Tax increment bonds are being used to finance 250 redevelopment projects in 121 cities and 3 counties. None of these bonds was specifically approved by the voters, and thus none of them is exempt from the 1 percent maximum tax restriction.
There are two troublesome aspects to petitioners' impairment argument, involving both timing and standing. First, it is readily apparent that petitioners' impairment of contracts argument is prematurely raised. Nothing on the face of article XIII A requires local agencies to default either in meeting their preexisting contracts or in liquidating their outstanding bonds. As we have seen, the ultimate operation of the article may result in a substantial reduction in the amount of available revenues, but as yet no direct impairment of any contract or bond has occurred by virtue thereof. No party to any contract or bondholder has so contended. As we have noted above, courts will avoid reaching constitutional objections when it is not absolutely necessary to the disposition of the *240 case before them. (Bayside Timber Co. v. Board of Supervisors, supra, 20 Cal. App.3d 1, 6.)
In the present cases, despite the reduction of revenues from property taxation, doubtless many local public entities will retain sufficient funds to meet preexisting contractual or bonded indebtedness rather than suffer default; allocation of surplus state funds (see Stats. 1978, chs. 292, 332) may assist other entities in these efforts.
As for redevelopment agencies, and other local agencies and districts relying upon property tax revenue for the retirement of bonds and other prior indebtedness which have not been voter approved, we note that the Legislature has created the Local Agency Indebtedness Fund to promote a public policy of protecting "the credit of the state and local agencies by assuring that no bond of a local agency goes into default." (Gov. Code, § 16496, added by Stats. 1978, ch. 292, § 18, italics added.) The new fund is designed to provide loans with a maximum three-year term for the purpose of preventing defaults on bonds during the 1978-1979 fiscal year "while local agencies are reorganizing revenue sources which support payments on such bonds." (Id., § 16496.5.) This legislation applies to bonds "which have not been specifically approved and authorized by the voters of the local agency prior to June 6, 1978" (id., § 16497, subd. (c)), including redevelopment bonds secured by tax increment revenues (id., § 16499, subd. (b), as amended by Stats. 1978, ch. 332, § 22). The legislation thus fills the gap not covered by the constitutional exemption.
Petitioners properly observe that the new legislation does not specify from what sources a state loan to a redevelopment agency might be repaid (as tax increment revenues presumably are reserved to the bondholders). Yet, as we have previously noted, the loans are made to prevent bond defaults while new revenue sources are being explored. We cannot assume on the face of the present record that no new revenue sources will be found or legislatively created. Thus, for all of the foregoing reasons, we are not able to conclude that default of prior contractual obligations is an inevitable consequence of article XIII A.
Petitioners extend their impairment argument, however, contending that the new restrictions upon the local taxing power necessarily have resulted in a present "depreciation" of the security relied upon by the various obligees for repayment of their obligations, and that accordingly the impairment issue is ripe for our consideration. According to *241 petitioners, any substantial restriction placed upon the taxing power of local governments accomplishes an immediate unlawful impairment of preexisting obligations, at least insofar as the discharge of these obligations may depend upon the availability of adequate tax revenues.
The authorities on which petitioners rely for the foregoing proposition are not in point. There is a line of cases holding generally that "a State may not authorize a municipality to borrow money and then restrict its taxing power so that the debt cannot be repaid. [Citations.]" (United States Trust Co. v. New Jersey (1977) 431 U.S. 1, 24, fn. 22 [52 L.Ed.2d 92, 111, 97 S.Ct. 1505], and cases cited, italics added.) These cases do not suggest, however, that an unlawful impairment occurs immediately upon imposition of the tax restriction, without regard to its ultimate effect upon the repayment of preexisting debts. The United States Trust Co. decision, on which petitioners primarily rely, involved a legislative repeal of an express covenant which had assured to bondholders that monies pledged as security for repayment would not be used to subsidize rail passenger transportation. The high court explained that "The parties [to a municipal contract] may rely on the continued existence of adequate statutory remedies for enforcing their agreement, but they are unlikely to expect that state law will remain entirely static. Thus, a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement. In this respect, the repeal of the 1962 covenant is seen as a serious disruption of the bondholders' expectations." (Id., at pp. 20-21, fn. 17 [52 L.Ed.2d at p. 108], italics added.)
Nor does the recent case of Allied Structural Steel Co. v. Spannaus (1978) 438 U.S. 234 [57 L.Ed.2d 727, 98 S.Ct. 2716] assist petitioners, for in that case the challenged statute expressly modified the employees' pension rights which previously had been fixed by contract. In the present case, article XIII A on its face neither directly repudiates any express covenant with municipal obligees nor immediately impairs any contract right. As described by the high court in Allied, the federal contract clause (art. I, § 10) applies only to a "substantial impairment of a contractual relationship." (Id., at p. 244 [57 L.Ed.2d at p. 736].) In the absence of a factual record disclosing any present, specific and substantial impairment of contract attributable to the adoption of article XIII A, we must reject petitioners' impairment of contract challenge because it is premature.
*242 A second defect in the impairment argument relates to petitioners' standing to assert the claim. It is noteworthy that, unlike the situation presented in the United States Trust Co. and Allied cases, none of the petitioners herein are municipal obligees, bondholders or creditors alleging an actual or potential impairment of their rights. In this connection, it is doubtful that petitioners possess the requisite standing to assert the invalidity of article XIII A on impairment of contract grounds. (See, e.g., Brock v. Superior Court (1939) 12 Cal.2d 605, 613-614 [86 P.2d 805]; In re Davis (1966) 242 Cal. App.2d 645, 666 [51 Cal. Rptr. 702]; 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 44 et seq.) As expressed in an earlier case, "... no obligation of any contract with the appellant has been impaired, and in the absence of a showing of injury on its part, it may not be heard." (Irrigation District v. Wutchumna W. Co. (1931) 111 Cal. App. 688, 696 [296 P. 933].)
We conclude that the challenge to article XIII A based upon the federal contract clause is premature and must await a case in which the contract rights of an obligee have been demonstrably impaired by the operation of the new article.

6. Initiative Title and Summary

(21a) According to petitioners, the preelection petitions which were circulated to qualify the initiative measure contained a misleading title and summary. The title, "Initiative Constitutional Amendment-Property Tax Limitation," was assertedly defective in its implication that only property taxes would be affected by the measure; in fact, other forms of state and local taxes were also involved. (Art. XIII A, §§ 3, 4.) Further, the summary of the measure stated in part that it "[a]uthorizes specified local entities to impose special taxes except ... [real property taxes]." In fact, section 4 of the measure restricts the imposition of such "special taxes" by imposing a two-thirds vote requirement. It is argued that each of these variances is fatal to the constitutional validity of the article.
Petitioners further observe that the sample ballots distributed in Alameda and San Diego Counties also contained the foregoing "defects." As for other counties, the ballot materials were corrected by court order: The title was changed to "Tax Limitation  Initiative Constitutional Amendment," and the summary was revised to read "[a]uthorizes imposition of special taxes by local government (except on real property) by 2/3 vote of qualified electors." According to respondents, these *243 corrections were incorporated into the voters pamphlet subsequently mailed to all registered voters. Nevertheless, petitioners insist that the petition signers, and certain voters in Alameda and San Diego Counties, may have been misled or confused by the incorrect title and summary.
(22) Prior to the circulation of an initiative measure, the Attorney General is required to prepare a title and summary of its "chief purposes and points"  not exceeding 100 words. (Cal. Const., art. II, § 10, subd. (d); Elec. Code, §§ 3502, 3503.) The Attorney General's statement must be true and impartial, and not argumentative or likely to create prejudice for or against the measure. (Elec. Code, § 3531.) The main purpose of these requirements is to avoid misleading the public with inaccurate information. (See Clark v. Jordan (1936) 7 Cal.2d 248, 249-250 [60 P.2d 457, 106 A.L.R. 549]; Boyd v. Jordan (1934) 1 Cal.2d 468, 471 [35 P.2d 533].) (23) We have said, however, that the title and summary need not contain a complete catalogue or index of all of the measure's provisions and "if reasonable minds may differ as to the sufficiency of the title, the title should be held sufficient." (Epperson v. Jordan (1938) 12 Cal.2d 61, 66 [82 P.2d 445].) As a general rule, the title and summary prepared by the Attorney General are presumed accurate, and substantial compliance with the "chief purpose and points" provision is sufficient. (Perry v. Jordan, supra, 34 Cal.2d 87, 94.)
(21b) In the present case, we conclude that the title and summary, though technically imprecise, substantially complied with the law, and we doubt that any significant number of petition signers or voters were misled thereby. We deem that the title, stressing only the property tax aspects of the initiative, was reasonably sufficient in light of the fact that the measure was principally addressed to the subject of real property tax relief. Similarly, the original summary was not so incomplete as to be fatally defective, because it alerted petition signers and voters alike to the fact that the measure contained a provision affecting the imposition of special taxes by local agencies. The summary's omission of any reference to the two-thirds vote requirement was not critical for, as we noted above, the initiative measure was extensively publicized and debated, in all of its several aspects, and a corrected summary was contained in the voters pamphlet which was mailed to all voters. We repeat our observation of some time ago that we ordinarily should assume that the voters who approved a constitutional amendment "... have voted intelligently upon an amendment to their organic law, the whole text of which was supplied each of them prior to the election and which they must be assumed to *244 have duly considered...." (Wright v. Jordan (1923) 192 Cal. 704, 713 [221 P. 915].)
We conclude that the initiative title and summary comply with existing legal requirements.

7. Vagueness

(24a) Petitioners have noted the existence of several words and phrases in article XIII A which assertedly are ambiguous or uncertain, suggesting that in its totality the new article is so vague as to be incapable of a rational and uniform interpretation and implementation. For precedential authority they rely by analogy on cases which have held that a statute must be sufficiently clear so as to provide adequate notice of prohibited conduct. (See, e.g., People v. Superior Court (Hartway) (1977) 19 Cal.3d 338, 345-347 [138 Cal. Rptr. 66, 562 P.2d 1315]; Bowland v. Municipal Court (1976) 18 Cal.3d 479, 491-493 [134 Cal. Rptr. 630, 556 P.2d 1081]; Morrison v. State Board of Education (1969) 1 Cal.3d 214, 231 [82 Cal. Rptr. 175, 461 P.2d 375]; see also Perez v. Sharp (1948) 32 Cal.2d 711, 728 [198 P.2d 17].)
In the present matter, unlike the foregoing cases, no civil or criminal penalties are at issue. Rather, we deal with a constitutional provision of a kind, similar to many others, which necessarily and over a period of time will require judicial, legislative and administrative construction. This is a fairly common procedure. (As an example, we note the broad and uncertain language of the various sections of art. I of the state Constitution, declaring the rights of the people, such as the right to be secure against "unreasonable seizures and searches" (§ 13).)
(25) In evaluating the contention that, in effect, article XIII A is void for vagueness, we are aided by several principles of construction applicable to constitutions generally. As was stated in an early case, "... since a written constitution is intended as and is the mere framework according to whose general outlines specific legislation must be framed and modeled, and is therefore ... necessarily couched in general terms or language, it is not to be interpreted according to narrow or super-technical principles, but liberally and on broad general lines, so that it may accomplish in full measure the objects of its establishment and so *245 carry out the great principles of government." (Stephens v. Chambers (1917) 34 Cal. App. 660, 663-664 [168 P. 595].)
(26) On the specific issue of vagueness, we have recently expressed the concept that, in the abstract, all "enactments should be interpreted when possible to uphold their validity [citation] and ... courts should construe enactments to give specific content to terms that might otherwise be unconstitutionally vague. [Citations.]" (Associated Home Builders etc., Inc. v. City of Livermore, supra, 18 Cal.3d 582, 598.) Significantly, in Livermore, the foregoing principles were employed to uphold an ordinance adopted by initiative.
(24b) Acknowledging as we must that article XIII A in a number of particulars is imprecise and ambiguous, nonetheless we do not conclude that it is so vague as to be unenforceable. Rather, in the usual manner, the various uncertainties and ambiguities may be clarified or resolved in accordance with several other generally accepted rules of construction used in interpreting similar enactments. Thus, California courts have held that constitutional and other enactments must receive a liberal, practical common-sense construction which will meet changed conditions and the growing needs of the people. (Los Angeles Met. Transit Authority v. Public Util. Com. (1963) 59 Cal.2d 863, 869 [31 Cal. Rptr. 463, 382 P.2d 583]; see People v. Davis (1968) 68 Cal.2d 481, 483 [67 Cal. Rptr. 547, 439 P.2d 651]; Rose v. State of California (1942) 19 Cal.2d 713, 723 [123 P.2d 505].) (27) A constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words. (In re Quinn (1973) 35 Cal. App.3d 473, 482 [110 Cal. Rptr. 881].) The literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers. (See Friends of Mammoth v. Board of Supervisors (1972) 8 Cal.3d 247, 259 [104 Cal. Rptr. 761, 502 P.2d 1049]; In re Kernan (1966) 242 Cal. App.2d 488, 491 [51 Cal. Rptr. 515].)
(28) Most importantly, apparent ambiguities frequently may be resolved by the contemporaneous construction of the Legislature or of the administrative agencies charged with implementing the new enactment. (See State of South Dakota v. Brown (1978) 20 Cal.3d 765, 777 [144 Cal. Rptr. 758, 576 P.2d 473]; Associated Home Builders etc., Inc. v. City of Livermore, supra, 18 Cal.3d at p. 598; Reynolds v. State Board of Equalization (1946) 29 Cal.2d 137, 140 [173 P.2d 551, 174 P.2d 4].) In addition, when, as here, the enactment follows voter approval, the ballot *246 summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the probable meaning of uncertain language. (See Carter v. Seaboard Finance Co. (1949) 33 Cal.2d 564, 580-581 [203 P.2d 758]; People v. Ottey (1936) 5 Cal.2d 714, 723 [56 P.2d 193]; In re Quinn, supra, 35 Cal. App.3d 473, 483.)
(24c) In the instant matter we have the advantage of both principal interpretive aids, those related to the ballot and the legislative-administrative construction. We focus primarily on the latter. The Legislature has already proceeded to implement article XIII A by enacting extensive legislation. (Stats. 1978, chs. 292, 332.) Administratively, the State Board of Equalization has adopted extensive regulations construing various provisions of the new article. (Cal. Admin. Code, tit. 18, regs. 460-471.) These legislative and administrative implementations are traditionally accorded great weight by the courts in construing enactments such as article XIII A. (State of South Dakota v. Brown, supra, at p. 777.)
We do not discuss each of article XIII A's numerous uncertainties claimed by petitioners, satisfied that the new legislation and administrative regulations adopted following popular approval of article XIII A disclose that relatively few such uncertainties remain. We do not, of course, thereby suggest that these implementing provisions necessarily constitute, in all instances, correct interpretations of the terms of article XIII A. Nonetheless, these interpretations, a few of which are illustrative, will materially assist both the state and the various local agencies in placing the new taxation scheme into operation in a reasonably workable fashion.
First, and most importantly, the Legislature has read the language of section 1, subdivision (a), ("The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties") as conferring authority to legislate on the subject and to apportion the tax funds to the local agencies and districts. The new legislation sets forth the applicable allocation formulae (Gov. Code, § 26912) and also gives guidance on the following matters, among many, which petitioners had found unclear from the face of article XIII A: (1) The new 1 percent maximum tax is to be levied by the counties on behalf of all local agencies and districts (Rev. & Tax. Code, § 2235); (2) the cities and counties are deemed "districts" under section 1 of the new article and thus share in the tax proceeds (Gov. Code, *247 § 26912; Rev. & Tax. Code, § 2217); (3) the 1 percent tax is a limit on the total, aggregate amount to be levied and apportioned by all local agencies and districts (Rev. & Tax. Code, § 2235, subd. (b)); (4) districts which encompass more than a single county will receive a share of the tax proceeds (Gov. Code, § 26912, subd. (d)), and (5) the exemption for prior, voter-approved indebtedness (art. XIII A, § 1, subd. (b)) includes amounts necessary to meet annual payments on the principal as well as the interest on such indebtedness (Gov. Code, § 26912, subd. (b)(3); Rev. & Tax. Code, § 2235, subd. (a)).
In addition, the new legislation construes or defines several of the undefined terms used in article XIII A, such as "full cash value" and "fair market value" (Rev. & Tax. Code, §§ 110, 110.1) and "change in ownership" (id., § 110.6). Further, the State Board of Equalization has adopted regulations covering these and other subjects. (See Cal. Admin. Code, tit. 18, ch. 1, subch. 4, regs. 460 ["full cash value" and "fair market value"], 462 ["change in ownership"], 463 ["newly constructed" property], and 464 [application of homeowners' and veterans' exemptions].)
In short, the foregoing implementing provisions doubtless have not resolved each and every uncertainty described by petitioners. Furthermore, these provisions remain subject to judicial challenge in subsequent cases on the basis that they may incorrectly manifest the intent of article XIII A. Nonetheless, it seems undeniable that good faith efforts have been made, and are presently being made, to carry into practical effect the collective will of a very substantial majority of our citizens, as reflected in the adoption of that article on June 6 of this year. Our analysis convinces us that article XIII A is not so vague and uncertain in its essential terms as to render it void and inoperable.
As noted above, we decline to reach the question whether the various interpretations put forth by the Legislature and State Board of Equalization are correct. In a somewhat similar connection we recently affirmed that "it seems apparent that we cannot, and should not, attempt to pass upon the meaning or validity of each contested provision in every hypothetical context  adjudication of these matters must await an actual controversy, and should proceed on a case-by-case basis as the need arises." (County of Nevada v. MacMillen, supra, 11 Cal.3d 662, 674.) *248 Many, perhaps most, of the uncertainties carefully noted by petitioners may disappear if a reasonable, common sense approach is used in the interpretation of article XIII A, and if appropriate weight is given to the contemporaneous construction of the legislative and administrative bodies charged with its enforcement in accordance with well established legal precedent.

CONCLUSION
Petitioners and the amici curiae who support them have mounted substantial and serious legal challenges to the provisions of article XIII A. In doing so they have expressed a commendable and sincere concern that the modifications of the California tax system which are mandated by the new article will impose intolerable financial hardships and administrative burdens in different forms and with varying intensity on public entities, programs, and services throughout California. Yet, as we have recently acknowledged, it is our solemn duty "`to jealously guard'" the initiative power, it being "`one of the most precious rights of our democratic process.'" (Associated Home Builders etc., Inc. v. City of Livermore, supra, 18 Cal.3d 582, 591, quoting from earlier cases.) Consistent with our own precedent, in our approach to the constitutional analysis of article XIII A if doubts reasonably can be resolved in favor of the use of the initiative, we should so resolve them. (Ibid.) This we have done.
Having carefully considered them, we have concluded that article XIII A survives each of the substantial challenges raised by petitioners. The orders to show cause previously issued in these cases are discharged, and the respective petitions are denied.
Tobriner, J., Mosk, J., Clark, J., Manuel, J., and Newman, J., concurred.
BIRD, C.J., Concurring and Dissenting.
Initiatives by their very nature are direct votes of the people and should be given great deference by our courts. Judges should liberally construe this power so that the will of the people is given full weight and authority. However, if an initiative conflicts with the federal Constitution, judges are duty bound to hold the offending sections unconstitutional.
When these principles are applied to the cases before this court, it is clear that article XIIIA is constitutional in all respects save one. I endorse *249 the majority opinion's view that there has not been a violation of the one subject rule, an impermissible revision of the Constitution, or a curtailment of the right to travel. Further, it is correct in holding that the question of impairment of contracts is not properly before this court and is not ripe for decision.
One issue remains which troubles me deeply. As judges we must be devoted to the preservation of the great constitutional principles which history has bequeathed to us. In article XIIIA, one of those principles has been violated  the equal protection clause. No one mindful of this nation's colonial history can seriously question the right of the people to act to redress tax grievances. However, our citizens also have a right to be treated equally before the law. The right to equality of taxation is as basic to our democracy as is the right to representation in matters of taxation. Under article XIIIA property taxpayers are not treated equally, and those sections which promote this disparity must fall.

I
Consider these facts. John and Mary Smith live next door to Tom and Sue Jones. Their houses and lots are identical with current market values of $80,000. The Smiths bought their home in January of 1975 when the market value was $40,000. The Joneses bought their home in 1977 when the market value was $60,000. In 1977, both homes were assessed at $60,000, and both couples paid the same amount of property tax. However, under article XIIIA in 1978, the Joneses will pay 150 percent of the taxes that the Smiths will pay. Should a third couple buy the Smiths' home in 1978, that couple would pay twice the taxes that the Smiths would have paid for the same home had they not sold it. Today, this court holds that such disparity is not only equitable, but that it does not violate the equal protection clause of the Constitution.
The basic problem with this position is that it upholds the adoption of an assessment scheme that systematically assigns different values to property of equal worth. By pegging some assessments to the value of property at its date of purchase and other assessments to the value of property as of March 1, 1975, article XIIIA creates an irrational tax world where people living in homes of identical value pay different property taxes. Thus, instead of establishing an assessment scheme with one basis by which all property owners are taxed, article XIIIA utilizes two bases, *250 acquisition date and 1975 market value, to impose artificial distinctions upon equally situated property owners.
Article XIIIA divides the property tax-paying public into two classes, pre- and post-1975 purchasers. Section 2(a) rewards those owners who purchased their property before March 1, 1975, by constitutionally fixing their tax assessments at lower figures than those who buy property of similar or identical value at a later date. This "roll back" provision confers substantial benefits upon one group of property owners not shared by other similarly situated owners. This provision raises the ugly specter of a race for tax savings in which the players start at different points, weighed down by different "handicaps."
Inequalities in state taxation have been held to be constitutional so long as they "rest upon some ground of difference having a fair and substantial relation to the object of legislation...." (Royster Guano Co. v. Virginia (1920) 253 U.S. 412, 415 [64 L.Ed. 989, 990, 40 S.Ct. 560]; see also Kahn v. Shevin (1974) 416 U.S. 351, 355-356 [40 L.Ed.2d 189, 193, 94 S.Ct. 1734]; Allied Stores of Ohio v. Bowers (1959) 358 U.S. 522, 526-527 [3 L.Ed.2d 480, 484, 79 S.Ct. 437]; Ohio Oil Co. v. Conway (1930) 281 U.S. 146, 159-160 [74 L.Ed. 775, 781-782, 50 S.Ct. 310].)
However, even minimal scrutiny requires that the statutes of the Legislature and the initiatives of the people be defensible in terms of a shared public good, not merely in terms of the purposes of a special group or class of persons. (See Tribe, American Constitutional Law (1978) p. 995.) The law should be something more than just the handmaiden of a special class; it must ultimately be the servant of justice.
Respondents fail to establish the general public benefit to be found in giving some, but not all, individuals a "roll back" to 1975 assessments. To be eligible for the full "roll back," article XIIIA requires that an individual have owned continuously his or her property since a date prior to March of 1975. This requirement makes it literally impossible for persons purchasing property in 1978 or thereafter to qualify for benefits granted fully to pre-1975 owners (and less fully to 1975-1978 owners). In so doing, article XIIIA transgresses the constitutional guarantee of equal protection under the law.
Respondents defend the rationality of the 1975 date by characterizing it as a cut-off date or "grandfather" clause. Although its arbitrariness is *251 conceded, they argue that it is defensible as a matter of administrative convenience. This contention lacks merit. It merely acknowledges that "it is difficult to be just, and easy to be arbitrary." (Stewart Dry Goods Co. v. Lewis (1935) 294 U.S. 550, 560 [79 L.Ed. 1054, 1059, 55 S.Ct. 525].) Administrative convenience is wholly inadequate to warrant preferred treatment of a closed class of property owners. This court has previously refused to accept administrative convenience as a sufficient explanation of "great" differences in tax rates among similarly situated individuals. (Haman v. County of Humboldt (1973) 8 Cal.3d 922, 927-928 [106 Cal. Rptr. 617, 506 P.2d 993]; cf. Toomer v. Witsell (1948) 334 U.S. 385, 398-399 [92 L.Ed. 1460, 1472-1473, 68 S.Ct. 1157].) In Haman, this court rejected the contention that administrative convenience justified a 23 percent spread in the rate at which California-registered and out-of-state registered fishing vessels were taxed. Article XIIIA may in individual cases cause a disparity in taxes which is much greater than 23 percent. This is especially true in those cases where the effect of inflation and appreciation on real property values has been acute.
The fact that the former property tax system allowed inequalities through exemptions for charitable, religious, nonprofit and educational institutions is no answer to the questions raised by article XIIIA. Those exemptions benefitted the general public since the public received specific benefits from the exempted organizations. No one has yet established what benefits the general public derives from the systematic undervaluation of the property of pre-1975 purchasers, and this court should decline to hypothesize rationales. (See Gunther, The Supreme Court, 1971 Term  Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection (1972) 86 Harv.L.Rev. 1, 33, 44-46, 47.)

II
The adoption of the acquisition date of property as the standard for valuation raises novel constitutional questions never decided by the Supreme Court. In analyzing section 2(a), this court must decide whether it is constitutionally permissible for a state to systematically assign unequal assessment to properties of concededly equal market value.
The practical effect of section 2(a) is to undervalue property purchased at an earlier date in comparison to the assessments assigned to subsequently purchased property. The extent of undervaluation will fluctuate *252 with the degree of property value appreciation in a particular locality. Given the "roll back" feature, the process inevitably starts by substantially undervaluing prior purchased property.
Once it is understood that article XIIIA systematically imposes different assessments on property of similar worth, a long line of Supreme Court cases becomes relevant. Those cases support the proposition that a person is denied equal protection of the law when his property is assessed at a higher value than property of equal worth in the same locale. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution.... And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property." (Sunday Lake Iron Co. v. Wakefield (1918) 247 U.S. 350, 352-353 [62 L.Ed. 1154, 1155-1156, 38 S.Ct. 495]; see also Raymond v. Chicago Traction Co. (1907) 207 U.S. 20, 36-37 [52 L.Ed. 78, 87-88, 28 S.Ct. 7]; Sioux City Bridge v. Dakota County (1923) 260 U.S. 441, 445 [67 L.Ed. 340, 342-343, 43 S.Ct. 190, 28 A.L.R. 979]; Cumberland Coal Co. v. Board (1931) 284 U.S. 23, 28-29 [76 L.Ed. 146, 149-150, 52 S.Ct. 48].)
In Sioux City Bridge, supra, the Supreme Court held it to be a violation of the equal protection clause to assess one company's property at 100 percent of its market value while other real estate in the same district was generally assessed at only 55 percent of the market value. Section 2(a) of article XIIIA authorizes the same kind of discrimination as that condemned in Sioux City Bridge. Initially, properties purchased in earlier years will be undervalued in comparison with other properties (though they may be identical in current fair market value) purchased, constructed, or transferred in later years. Then, as the years go by, the skewed nature of the tax world created by article XIIIA will become even more pronounced as each successive generation of purchasers will have their property overvalued in comparison to their neighbors or predecessor owners. For example, consider the condominium complex where each unit, though of identical fair market value, receives a different tax assessment simply because purchased in a different year. Consider the plight of the military family required by circumstances to change residence periodically. In 1979, that family may sell a house purchased in 1975, and buy a new house of identical current cash value. However, their *253 tax bill will take a quantum leap upward, as their assessment jumps from 1975 to 1979 levels. Conversely, the family allowed by circumstances to remain in one house for long periods of time will reap substantial tax benefits simply because of the length of their residency.
Consider further the plight of the family which "newly constructs" their house after a natural disaster such as fire or flood. Article XIIIA, section 2(a) penalizes them by reassessing the value of their house to market value at the time of the new construction. What is the possible rationale for allowing natural disasters to trigger an increase in property tax obligations? Surely a truly rational tax world would consider such families for tax relief.[1] Finally, consider the reassessment to current market value mandated by section 2, subdivision (a) for "changes in ownership" brought about by divorce or death. Did those who voted so overwhelmingly for article XIIIA's general tax relief also intend to penalize those families who experience such family crises?
In Cumberland Coal Co. v. Board, supra, 284 U.S. 23, the Supreme Court invalidated a taxing measure that ignored differences in current market value. In that case, the local assessors chose to assign the same dollar value per ton to all unmined coal in the county. However, it was undisputed that there existed substantial differences in value between given tons of coal, depending on the mining and transportation costs. The court saw clearly the gross inequalities that resulted, even though the same percentage tax was levied on all: "... the fact that a uniform percentage of assigned values is used, cannot be regarded as important if, in assigning the values to which the percentage is applied, a system is deliberately adopted which ignores differences in actual values so that property in the same class as that of the complaining taxpayer is valued at the same figure (according to the unit of valuation, as, for example, an acre) as the property of other owners which has an actual value admittedly higher. Applying the same ratio to the same assigned values, when the actual values differ, creates the same disparity in effect as applying a different ratio to actual values when the latter are the same." (Id., at p. 29 [76 L.Ed. at p. 150].)
Article XIIIA adopts an assessment scheme similar in effect to that condemned in Cumberland Coal. The same percentage (one percent) is *254 applied to all assessed values; but the assessed values themselves do not accurately reflect the respective market values of property. This has the effect, as the court noted in Cumberland Coal, supra, 284 U.S. at page 29 [76 L.Ed. at p. 150], of taxing identically situated property owners at different percentages of the true value of their property. If article XIIIA had been drafted to say, "Some persons will pay a property tax of one percent of the true value of their property; others will pay only a one-half of one percent tax," the violation of the equal protection clause would have been obvious. Yet, the result under article XIIIA is the same. Assume, for instance, that the market value of a home increases from $50,000 in 1975 to $100,000 some time in the future. A one percent tax on the 1975 value is equivalent to a one-half of one percent tax on the new value.
Decisions in this jurisdiction have reiterated the principle that the equal protection clause is violated when one person's property is assessed at a higher level than another person's property which is of identical value. For example, in Birch v. County of Orange (1921) 186 Cal. 736, 741 [200 P. 647], this court held that a taxpayer is entitled to "the exercise of good faith and fair consideration on the part of the taxing power in assessing his property, at the same rate and on the same basis of valuation as that applied to other property of like character and similarly situated."
The Court of Appeal recently restated this principle: "The value of property for assessment purposes is to be determined ... on such basis as is used in regard to other property so as to make all assessments as equal and fair as is practicable. [Citations.] In order to carry out this principle, the assessor and the county board of equalization must apply the same ratio to market value uniformly within the county." (Glidden Company v. County of Alameda (1970) 5 Cal. App.3d 371, 378 [85 Cal. Rptr. 88, 86 Cal. Rptr. 464]; see also Simms v. County of Los Angeles (1950) 35 Cal.2d 303, 315 [217 P.2d 936]; Mahoney v. City of San Diego (1926) 198 Cal. 388, 397, 404 [245 P. 189]; Metropolitan Stevedore Co. v. County of Los Angeles (1972) 29 Cal. App.3d 565, 572 [105 Cal. Rptr. 595]; City of Los Angeles v. County of Inyo (1959) 167 Cal. App.2d 736, 740 [335 P.2d 166]; Rancho Santa Margarita v. San Diego Co. (1932) 126 Cal. App. 186, 197 [14 P.2d 588]; Birch v. County of Orange (1927) 88 Cal. App. 82, 85 [262 P. 788].) Thus, strong authority exists for the conclusion that the attempt of article XIIIA to assign different assessments to properties of equal market value violates the equal protection clause.
*255 Respondents would seek to deny that those who pay more for property are in reality "similarly situated" with those who paid less for property of the same value in earlier years. The premise of this argument is that the later purchaser is better able to afford a high tax since (1) he paid more for his property to begin with and (2) he knew from the beginning he was buying a highly assessed piece of property.
The fact that a purchaser presently pays $80,000 for a home which someone else bought for $40,000 in 1975 may tell us nothing more than that inflation has been rampant and property values on the rise. In fact, the higher mortgage payments that new homeowners pay as compared to earlier purchasers forewarns us against any cavalier assumption that later purchasers are able to bear heavier taxes.
Section 2(a) mandates reassessment to current market value not only for voluntary purchasers but any time there is a "change in ownership." Thus, as previously noted, the person who inherits the family home or the spouse who gains title to property after a divorce may find that the assessment on the property suddenly skyrockets for property tax purposes. There is no rationality to the jump in valuation that accompanies these occurrences. Similarly, those persons who must move often because of the nature of their employment (for example, military families) will find that section 2(a)'s mandated reassessments bear little relation to their financial situation. Even more perplexing is the situation of persons who find that new construction must be done to their property after a natural disaster. Section 2(a) once more requires reassessment to "full cash value." The arbitrariness of article XIIIA's assessment scheme could not be more apparent.
Finally, the arbitrariness of the acquisition date valuation as a tax standard can be demonstrated by considering the plight of the taxpayer whose property has actually decreased in value since 1975. Under the previous tax system, such a person's property tax assessment would eventually reflect the decline in market value. However, under article XIIIA the assessment remains fixed at the acquisition date value since section 2(b) allows for a reduction in assessment only on the basis of a downward turn in the consumer price index.
I am aware that during the past 40 years, since the end of the Lochner era (see Lochner v. New York (1905) 198 U.S. 45 [49 L.Ed. 937, 25 S.Ct. 539]), courts have not used the Fourteenth Amendment "to strike down *256 state laws ... because they may be unwise, improvident, or out of harmony with a particular school of thought." (Williamson v. Lee Optical Co. (1955) 348 U.S. 483, 488 [99 L.Ed. 563, 572, 75 S.Ct. 461].) I fully agree that in regard to matters of economics and tax policy, courts must defer to the will of the people unless the challenged enactment lacks a rational basis. However, the rational basis test was never meant to authorize judicial tolerance of unconstitutional classifications.
Earlier this year, this court reiterated that minimal scrutiny "`require[s] the court to conduct "a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals."'" (Cooper v. Bray (1978) 21 Cal.3d 841, 848 [148 Cal. Rptr. 148, 582 P.2d 604], quoting Newland v. Board of Governors (1977) 19 Cal.3d 705, 711 [139 Cal. Rptr. 620, 566 P.2d 254], italics original in Cooper v. Bray, supra.) After conducting such a "serious and genuine judicial inquiry," many courts have found that various classifications could not survive even minimal scrutiny under the equal protection clause. (E.g., U.S. Dept. of Agriculture v. Moreno (1973) 413 U.S. 528, 538 [37 L.Ed.2d 782, 790, 93 S.Ct. 2821]; Rinaldi v. Yeager (1966) 384 U.S. 305, 309-310 [16 L.Ed.2d 577, 580-581, 86 S.Ct. 1497]; D'Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 22-23 [112 Cal. Rptr. 786, 520 P.2d 10]; Blumenthal v. Board of Medical Examiners (1962) 57 Cal.2d 228, 234-235 [18 Cal. Rptr. 501, 368 P.2d 101]; Miller v. Union Bank & Trust Co. (1936) 7 Cal.2d 31, 34-36 [59 P.2d 1024].) Some of the classifications which were invalidated related to matters of taxation. (E.g., WHYY v. Glassboro (1968) 393 U.S. 117, 120 [21 L.Ed.2d 242, 245, 89 S.Ct. 286]; City of Los Angeles v. Shell Oil Co. (1971) 4 Cal.3d 108, 125-126 [93 Cal. Rptr. 1, 480 P.2d 953]; County of Alameda v. City and County of San Francisco (1971) 19 Cal. App.3d 750, 756-757 [97 Cal. Rptr. 175, 48 A.L.R.3d 332].) The lines drawn by section 2(a) of article XIIIA are similar in effect to the discriminatory categories struck down in those cases. If a serious and genuine judicial inquiry is made of the classifications under section 2(a), it is clear that they violate the equal protection clause of the Constitution by treating identical or similarly situated property taxpayers in an unfair and unequal way.

III
This decision has not been an easy one. The issues are close and reasonable people may differ. Emotions run high on this question, but as judges we must follow the law and do what it requires. As Justice Story *257 wrote in Trustees of Dartmouth College v. Woodward (1819) 17 U.S. (4 Wheat.) 250, 338 [4 L.Ed. 629, 713], "It is not for judges to listen to the voice of persuasive eloquence, or popular appeal. We have nothing to do, but to pronounce the law as we find it; and having done this, our justifications must be left to the impartial judgment of our country."

APPENDIX

ARTICLE XIII A
"Section 1. (a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.
"(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective.
"Section 2. (a) The full cash value means the County Assessors valuation of real property as shown on the 1975-76 tax bill under `full cash value,' or thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-76 tax levels may be reassessed to reflect that valuation.
"(b) The fair market value base may reflect from year to year the inflationary rate not to exceed two percent (2%) for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction.
"Section 3. From and after the effective date of this article, any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed.
"Section 4. Cities. Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district.
"Section 5. This article shall take effect for the tax year beginning on July 1 following the passage of this Amendment, except Section 3 which shall become effective upon the passage of this article.
"Section 6. If any section, part, clause, or phrase hereof is for any reason held to be invalid or unconstitutional, the remaining sections shall not be affected but will remain in full force and effect."
NOTES
[1] It is noteworthy that a proposed constitutional amendment to remedy this anomalous situation has been adopted by the Legislature and awaits a vote of the people. (Sen. Const. Amend. No. 67. Stats. 1978 (1977-1978 Reg. Sess.) res. ch. 76. pp. ___.)