Filed 2/25/25; Certified for Publication 3/17/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| PACIFIC BELL TELEPHONE COMPANY et al., | F087825 |
| Plaintiffs and Appellants, | (Super. Ct. No. 23CV-02355) |
| v. | **ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |
| COUNTY OF MERCED et al., | |
| Defendants and Respondents. | |

It is hereby ordered that the opinion filed herein on February 24, 2025, be modified as follows:

On page, 19 insert footnote No. 9 immediately after the first sentence of the first full paragraph, which reads: "Appellants' arguments about the "unbroken public and governmental understanding" of Section 19 as instituting rate protections for utility companies are not persuasive."

**9** This section of appellants' argument is based largely on documents of which they seek judicial notice. Although most of these were lodged with the trial court as exhibits to the FAC, judicial notice was not sought or warranted in the trial court. Appellants' request for judicial notice filed on April 30, 2024 was unopposed. We take judicial notice of Exhibits 1, 2, 3, 6, 10, 16, 17, and 20. We decline to grant judicial notice of Exhibits 4, 5, 7, 8, 9, 11, 12, 13, 14, 15, 18, 19, and 21 as they are not relevant to the resolution of this case. (*City of Hesperia v. Lake Arrowhead Community*

*Services District* (2023) 93 Cal.App.5th 489, 509; *Guarantee Forklift, Inc. v. Capacity of Texas Inc.* (2017) 11 Cal.App.5th 1066, 1075.)

Additionally, on November 18, 2024, appellants filed a supplemental request for judicial notice in connection with their reply. We decline to grant judicial notice of the documents contained therein, as they are irrelevant to the resolution of this case.

Except for the modification set forth, the opinion previously filed remains unchanged.

This modification does not effect a change in the judgment.

FRANSON, ACTING P. J.

**WE CONCUR:**

MEEHAN, J.

DESANTOS, J.

Filed 2/24/25 (unmodified opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| PACIFIC BELL TELEPHONE COMPANY et al., | F087825 |
| Plaintiffs and Appellants, | (Super. Ct. No. 23CV-02355) |
| v. | **OPINION** |
| COUNTY OF MERCED et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Merced County.  Brian L. McCabe, Judge.

Munger, Tolles & Olson, Benjamin J. Horwich, Gabriel M. Bronshteyn, Ginger D. Anders, Andra Lim, Faye Paul Teller; Capitol Law and Policy and Eric J. Miethke for Plaintiffs and Appellants.

Greenberg Traurig, Colin W. Fraser, Cris K. O'Neall and Bradley R. Marsh for California Taxpayers Association, Orange County Taxpayers' Association, California Business Roundtable, The Howard Jarvis Taxpayers Association and the California Chamber of Commerce as Amici Curiae on behalf of Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Bradley J. Hamburger, Shannon Mader and Nicholas Whetstone for California Senior Alliance, National Diversity Coalition, The Two Hundred for Homeownership, Community Repower Movement, RestoreLA-CDC, California Consumer Advocates for Affordability and Safety and the California Black Chamber of Commerce as Amici Curiae on behalf of Plaintiffs and Appellants.

Forrest W. Hansen, County Counsel, and Joel A. Guerra, Deputy County Counsel, for Defendants and Respondents.

-ooOoo-

## INTRODUCTION

This case concerns the interpretation of section 19 of article XIII of the California Constitution (Section 19), and whether it requires the same *tax rates* be imposed on utility property that are imposed on so-called "common property," i.e., non-utility property subject to standard ad valorem taxation.[1] Section 19 was enacted in the early 1930's to alter the manner in which utilities were taxed. Prior to that time, utilities were subject to a special gross receipts "in lieu" tax imposed at the state level, used to support state government. Section 19 changed this tax structure in order to subject utilities to an ad valorem property tax payable at the local level, like most other property taxes. However, because the fair market value of real property owned by utilities is typically only a fraction of the actual value it holds for the company, a different valuation system was adopted for utility property. The value of utility property was thus computed at the state level, valuing the utility as a going concern,[2] and then allocated between the various counties in the state.

---

[1]     An ad valorem tax is imposed based on the value of the property.

[2]     Valuing utilities as "a going concern" rather than based on separate assets is referred as "unit" valuation.

Ad valorem taxes in California are comprised of two separate components: a tax capped at one percent which goes to fund general services, and a debt service component which is not subject to the same one percent cap. While the general one percent property tax is imposed equally for both utility and non-utility property, the debt service component is calculated differently between the two types of property. Because debt is incurred and serviced by numerous taxing entities within a county, including school districts, water districts, and other special districts, each county presents hundreds or even thousands of potential overlapping combinations of debt servicing requirements. While this is not difficult to apply to a parcel of common real property, which is stationary and taxed on the basis of its value in that particular location, it is significantly more difficult to apply to utilities, which are taxed based on the portion of a state-assessed value that is equitably allocated to the county as a whole.

In order to streamline the administration of this system, the Legislature enacted a series of laws between 1986 and 1994 that became what is now codified as Revenue and Taxation Code section 100. Put briefly, that section contains a formulary tax rate to be applied to the value of the property allocated to the county by the Board of Equalization (the Board), and then further dictates how the taxes will be allocated within that county. The issue raised in this case is whether Merced County's application of Revenue and Taxation Code section 100 to calculate the debt service component of appellants' property taxes violated Section 19 for certain tax years.

We conclude, as did the Sixth District in *County of Santa Clara v. Superior Court* (2023) 87 Cal.App.5th 347 (*Santa Clara*), that the relevant language in Section 19 does not mandate that the same tax rate must be applied to utility property as is applied to locally assessed property. We find the language in question—"This property shall be subject to taxation to the same extent and in the same manner as other property"—was intended as an enabling clause, making property taxable that, before, was not taxable. It

3.

does not mean, as the appellants contend, that utility property must be taxed at precisely the same rate as common property. For this reason, we affirm the judgment below.

## PROCEDURAL BACKGROUND

This case comes to us at the pleading stage, and therefore we take the facts pleaded in appellants' complaint as true. Appellants consist of five public utilities operating in this state: Pacific Bell Telephone Company; AT&T Mobility LLC; Sprint Telephony PCS, L.P.[3]; T-Mobile West LLC; and CenturyLink Communications, LLC[4]. As such, all of their taxable property in the state is assessed on a state-wide basis by the Board, which then prepares and transmits a roll sent to each county auditor showing the assessments determined to be attributable to that county. (Cal. Const., art. XIII, § 19; Rev. & Tax. Code, §§ 721, 722.) Each county then calculates and applies the tax rate pursuant to Revenue and Taxation Code section 100, subdivision (b), after which the taxes are then allocated to the various taxing entities within the county.

For fiscal years 2017-2018 and 2018-2019, the Board assessed appellants' values at a state level, and transmitted an allocation to respondent Merced County (County). County then applied a tax rate to the allocated values based on the calculation specified in Revenue and Taxation Code section 100, which resulted in property taxes totaling approximately $2.2 million across the utilities for the two tax years. Appellants fully paid these taxes. In 2021 and 2022, appellants sought partial refunds of these property taxes of approximately $550,000, again, across all five utilities over both tax years.

Appellants alleged these refunds were due because the application of the calculation specified in Revenue and Taxation Code section 100 resulted in tax rates on appellants that exceeded those permissible under Section 19 of the California

---

[3] Appellant Sprint Telephony PCS, L.P. was formerly known as Sprint Spectrum L.P., and both are listed separately as appellants.

[4] Level 3 Communications, LLC is also listed separately as an appellant but on November 1, 2017 was acquired by appellant Century Link Communications, LLC.

4.

Constitution.  More particularly, appellants claimed the property tax rate exceeded the average tax rate calculated and published by the Board for property taxes in the county. According to appellants, the average tax rate in the county was 1.094 percent in 2017 and 1.088 percent in 2018.  However, the tax rate allegedly levied on appellants was 1.4746 percent in 2017 and 1.4673 percent in 2018.

Appellants claim having an applicable tax rate higher than the average tax rate in the county violates Section 19, which states utility property "shall be subject to taxation to the same extent and in the same manner as other property."  (§ 19.)  Appellants thus brought an action for refund in Merced County Superior Court in July 2023.

Following the filing of a first amended complaint, County demurred in February 2024.  County's demurrer was based entirely on the Sixth District's holding in *Santa Clara*, which it found was binding precedent requiring dismissal.  Appellants conceded *Santa Clara* was binding and required dismissal, but maintained they had a good faith basis to challenge the holding of *Santa Clara* on appeal.  The parties stipulated to dismissal on February 16, 2024, pursuant to the rule in *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, where if " 'consent was merely given to facilitate an appeal following adverse determination of a critical issue, the party will not lose his right to be heard on appeal,' " despite having consented to judgment.  (*Id.* at p. 400.)

A timely notice of appeal was filed.

## DISCUSSION

### I.     STANDARD OF REVIEW

Because only legal issues are implicated in this appeal following demurrer, our review is de novo.  (*Limon v. Circle K Stores Inc.* (2022) 84 Cal.App.5th 671, 688; *People v. Accredited Surety & Casualty Co.* (2022) 77 Cal.App.5th 185, 190.)

## II.    *ITT WORLD COMMUNICATIONS* DOES NOT CONTROL THIS CASE

Appellants' first argument is that the issue of whether Section 19 limits utility property tax rates to the same rate as locally assessed property has already been decided by the California Supreme Court in *ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859 (*ITT*).  Ultimately, we agree with our sister court's finding in *Santa Clara* that *ITT* does not control the outcome of this case, since its comments on applicable tax rates are dicta and not precedent.

A good summation of the background of Section 19 is included in *ITT*, and we quote at length from the court's historical explication there:

> "In 1935 the current system of ad valorem unit taxation of public utility property, now defined by article XIII, section 19, of the California Constitution and Revenue and Taxation Code section 721 et seq., came into effect.  Under this system all property, other than franchises, owned or used by public utilities is annually assessed and subjected to taxation.  (Cal. Const., art. XIII, § 19; [Rev. & Tax. Code,] §§ 721–722, 755–756.)  Under the system that had prevailed from 1910 into the 1930's, there was a separation of sources of tax revenue:  public utility property was subject to a special gross receipts 'in lieu' tax levied and collected by the state to support state government, and other property was subject to the regular ad valorem property tax levied and collected by local government to support itself.  (Bertane, *The Assessment of Public Utility Property in California* (1973) 20 UCLA L.Rev. 419, 423–424 (hereinafter Bertane, *Public Utility Property*).)

> "By the early 1930's, however, the Great Depression had brought about a crisis in taxation as in other aspects of public and private life, and there arose general dissatisfaction with this system of taxation.  Local tax rates were believed to be too high, in part because public utility property was not on the local tax rolls; state revenues were believed to be too low, in part because public utility tax rolls could be raised only by a two-thirds vote of the Legislature (Cal. Const., former art. XIII, § 14, subd. (f)) and the public utilities possessed sufficient political power to block such tax increases (see Rep. of State Bd. of Equalization for 1931–1932 (1932) p. 12).  In the face of this crisis, the Legislature drafted and the voters adopted an amendment to the Constitution known as the Riley-Stewart Plan, which completely revised this system of taxation.  The special gross receipts 'in lieu' tax was repealed and public utility property was subjected to the regular ad valorem

6.

property tax, thus restoring public utility values to the local tax rolls and alleviating the local tax burden; the political problems inherent in taxing public utilities at the state level pursuant to legislatively set rates were eliminated by having public utility property centrally assessed by the Board.

"One of the primary objectives of the system of unit taxation of public utility property is to ascertain and reach with the taxing power the entire real value of such property. (See Plan for Tax Relief presented in Sen. Const. Amend. No. 30 and Assem. Const. Amend. No. 68 to be Submitted as Prop. 1 on Ballot of June 27, 1933, p. 8 (hereinafter Plan for Tax Relief); Bertane, *Public Utility Property, supra*, 20 UCLA L.Rev. at pp. 426–427, 433.) It has long been recognized that 'public utility property cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system. Ten miles of telephone wire or one specially designed turbine would have a questionable value, other than as scrap, without the benefit of the rest of the system as a whole.' (Bertane, *Public Utility Property, supra,* at p. 433.) Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole, undifferentiated into separate assets (land, buildings, vehicles, etc.) or even separate kinds of assets (realty or personalty).

"The unit taxation of public utility property is effected in four general stages. First, the Board annually assesses all unitary property of each public utility, that is, all property that it uses in performing its function. ([Rev. & Tax. Code,] § 723.) In making this assessment, the Board uses the principle of unit valuation: it determines the value of the property as a whole, rather than the value of any of the assets as parts of the whole; it does not assess each asset and then total up the valuation, but values the property as a unit, primarily through a capitalized earnings approach. Second, the owner of the public utility property is offered an opportunity to apply for corrections. ([Rev. & Tax. Code,] §§ 731, 741–749.) Third, the Board transmits to the local taxing authority a roll showing the assessments against public utility property situated within its jurisdiction. ([Rev. & Tax. Code,] §§ 755–756, 758.) In accordance with the principle of unit valuation, such assessments do not represent the value of the assets situated within that jurisdiction; rather, they represent the share of the value of the property as a whole that the Board has determined should equitably be allocated to the jurisdiction. Thus, after it has assessed the value of the property as a whole, the Board makes a formulary allocation that has little or no relationship to the actual fair market value of the particular assets

7.

situated within the jurisdiction. Fourth, the local taxing authority subjects the property so assessed to taxation at the rate fixed in its jurisdiction. (See [Rev. & Tax. Code,] §§ 755–756.)" (*ITT, supra*, 37 Cal.3d at pp. 862–864, fns. omitted.)

In *ITT*, the Court considered the effect of article XIII A of the California Constitution in relation to Section 19, and particularly a rollback on property valuation and additional valuation limitations enacted in article XIII A. Article XIII A, which was enacted by initiative in 1978, is more commonly known as Proposition 13 and contained a number of tax reform provisions. (*Amador Valley Joint Union High School District v. State Board of Equalization* (1978) 22 Cal.3d 208, 218.) As relevant to the *ITT* court, article XIII A reduced the taxes paid by taxpayers by changing the *valuation* of their real property: it used the value assessed in the 1975-1976 tax year as the starting point, and permitted taxes on the property to grow at a maximum of two percent per year to reflect inflation. (*Ibid.*) A new valuation would only be conducted on property newly constructed or subject to a change of ownership occurring after the 1975 assessment. (*Ibid.*)

In *ITT*, ITT World Communications, Inc. (Worldcom), a public utility, sought to apply article XIII A's *valuation* rollback provisions to property taxes imposed on public utilities.[5] Worldcom first argued article XIII A applied directly to it. (*ITT, supra*, 37 Cal.3d at p. 864.) The Supreme Court disagreed, finding that, by its terms, article XIII A applied only to the valuation of "real property." (*ITT, supra,* at pp. 864–866.) Because

---

[5]    The arguments by the parties in *ITT* were limited to the valuation rollback provisions of article XIII A, and did not address the tax rates that were later applied. As the opening sentence of the opinion stated: "The question in this case is whether the 'valuation rollback provision of article XIII A, section 2, subdivision (a) of the California Constitution…applies to unit taxation of public utility property…Plaintiff ITT [World Com] brought this action for a property tax refund, alleging that the [taxing authorities] acted illegally in refusing to adjust the assessment of Worldcom's property to its 1975-1976 value in accordance with the valuation rollback provision." (*ITT, supra*, 37 Cal.3d at p. 862.)

utilities are subject to unit valuation, they are valued as a going concern, not as real property. (*Ibid.*) Further, the Court noted the valuation rollback in article XIII A by its terms applied only to locally-assessed property, which did not include utilities, which are assessed by the state. (*ITT, supra,* at pp. 866–869.)

After its main arguments for applying the assessment rollback failed, Worldcom advanced the argument that the rollback provisions of article XIII A applied to it indirectly through a clause in Section 19, the same language at issue in this case: that "by requiring public utility property to be 'subject to taxation to the same extent and in the same manner as other property,' [Section 19] requires public utility property to be *valued* on the same basis as other property, and thereby effectively applies the valuation rollback provision to the unit taxation of public utility property." (*ITT, supra,* 37 Cal.3d at pp. 869–870, original italics.) The Supreme Court disagreed. (*Ibid.*) It noted the broad purpose of Section 19 was to "authorize the unit taxation of public utility property" and "more narrowly to '[assure][] *adequate valuation* of utility property.' " (*ITT, supra,* at p. 870, italics added.) It then stated: "By requiring that public utility property be 'subject to taxation to the same extent and in the same manner as other property,' [Section 19] does not impose a requirement of equal valuation between public utility and other property, but simply specifies that public utility property, after it has been placed on the local tax rolls, be levied on at the same *rate* as locally assessed property, instead of being subject to a special gross receipts 'in lieu' tax. In other words, this comparability requirement was not intended to apply to the *valuation* of public utility property, but only to its *taxation* after assessment." (*Ibid.*, italics original.)

As the Sixth District correctly noted in *Santa Clara*, however, *ITT* was a case about *valuation*, not about tax rates. (*Santa Clara*, *supra,* 87 Cal.App.5th at pp. 370–371.) "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2; see *Geiser v.*

9.

*Kuhns* (2022) 13 Cal.5th 1238, 1252 [" ' " 'cases are not authority for propositions not considered' " ' "]; *B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11 [same]; *American Federation of Labor v. Unemployment Insurance Appeals Board* (1996) 13 Cal.4th 1017, 1039 [same].) Because *ITT* was indisputably about valuation, not tax rates, the issue of whether Section 19 requires the same tax rates be applied to utility property and common property was not argued and decided, and statements that suggest otherwise are merely dicta. Worldcom did not challenge the tax rates imposed on appeal and the Supreme Court's unnecessary language on tax rates in *ITT* does not control here.

III.    SECTION 19 DOES NOT REQUIRE TAXATION AT THE SAME RATE BETWEEN UTILITY PROPERTY AND COMMON PROPERTY

Appellants next assert that, even if *ITT* does not control the outcome in this case, we should hold that Section 19 requires utilities to be taxed at the same rate as common property. Reviewing the language, structure, and history of Section 19, we conclude this is not a correct reading of the clause in question. Section 19 does not bar disparate tax rates between common property and utility property.

When analyzing a constitutional provision enacted by the voters, we begin with its text, understood within the context of its enactment, "because that is typically the best and most reliable indicator of the voters' intent." (*In re Febbo* (2020) 52 Cal.App.5th 1088, 1097.) "We start by ascribing to words their ordinary meaning, while taking account of related provisions and the structure of the relevant statutory and constitutional scheme." (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933.) If a review of the text and structure of the provision does not resolve the issue, we may consider extrinsic sources, such as legislative history in the case of a statute or, in the case of a ballot initiative, the accompanying ballot materials. (*Id.* at pp. 933–934; *Febbo,* at p. 1097; *Sutter's Place, Inc. v. California Gambling Control Commission* (2024) 101 Cal.App.5th 818, 832–33.) Our goal in this endeavor is to interpret and apply the language of the enactment "in a manner consistent with the probable intent of the body

10.

enacting it: the voters of the State of California." (*Hill v. National Collegiate Athletic Association* (1994) 7 Cal.4th 1, 16.)

Section 19, of the California Constitution, states in its entirety:

"The Board shall annually assess (1) pipelines, flumes, canals, ditches, and aqueducts lying within 2 or more counties and (2) property, except franchises, owned or used by regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and companies transmitting or selling gas or electricity. *This property shall be subject to taxation to the same extent and in the same manner as other property.*

"No other tax or license charge may be imposed on these companies which differs from that imposed on mercantile, manufacturing, and other business corporations. This restriction does not release a utility company from payments agreed on or required by law for a special privilege or franchise granted by a government body.

"The Legislature may authorize Board assessment of property owned or used by other public utilities.

"The Board may delegate to a local assessor the duty to assess a property used but not owned by a state assessee on which the taxes are to be paid by a local assessee." (Italics added.)

The language at the heart of the dispute in this case is emphasized at the end of the first paragraph: "[t]his property"—i.e, all property "except franchises" owned or used by specific utilities in California—"shall be subject to taxation to the same extent and in the same manner as other property." (§ 19.) The dispute in this case centers on whether this language is an enabling clause, announcing generally that certain utility property is now taxable, or a limiting clause, saying utility property may only be taxed at the same rate as other property.[6] Obviously, Section 19 contains no express limitation on taxing utility

---

[6]  An enabling clause is a specific part of a law or constitution that gives authority to a government official or body to implement and enforce that law. (See Black's Law Dict. (12th ed. 2024) ["clause"]; *Western Indemnity Co. v. Pillsbury* (1915) 170 Cal. 686, 701 [an "enabling clause … authorizes the Legislature" to enact further legislation].)

property at a different rate than common property.  Tax rates are not mentioned.  Rather, the limitation, if one exists, is implicit in the phrase "to the same extent."

While the phrase "to the same extent" reviewed in isolation may be susceptible of more than one interpretation, our interpretation of a provision is broader, and looks to the language used in other portions of the same enactment.  (See *People v. Raybon* (2021) 11 Cal.5th 1056, 1068.)  The second paragraph of Section 19 expressly limits the types of taxes that may be imposed on utilities, noting that "[n]o other tax … may be imposed on these companies which differs from that imposed on mercantile, manufacturing, and other business corporations."  (§ 19.)  Section 19 then provides an exception to that rule, where a payment agreed upon "for a special privilege or franchise granted by a government body" is not released merely because it differs from other businesses.  (*Ibid.*)  Thus, it is apparent the drafters of Section 19 knew how to draft affirmative limitations restricting the ability to tax utilities when they intended to provide them.  The fact that they did not do so in the first paragraph strongly weighs in favor of interpreting the language as an enabling clause, not a limiting clause.[7]

The structure of Section 19 more generally supports this interpretation.  It is well established that, prior to the enactment of Section 19, utility property was not subject to property taxes at all, but rather a special tax on gross receipts.  (*ITT, supra,* 37 Cal.3d at pp. 862–864.)  The first sentence of Section 19 requires the Board to "assess" certain property, but does not by its own language impose or authorize any taxation of that property.  That authorizing language is instead found in the second sentence.  It makes

---

[7]    A similar conclusion can be drawn from the language in article XIII, section 2 of the California Constitution, which counsel noted at oral argument was enacted at the same time as Section 19.  Section 2, which concerns personal property taxes, states:  "The tax on [certain personal property] shall not exceed four-tenths of one percent of full value, and the tax per dollar of full value shall not be higher on personal property than on real property in the same taxing jurisdiction."  (Cal. Const., art. XIII, § 2.)  Again, this is clearly a rate cap, indicating the drafters knew how to draft a rate cap when they wished to implement one.

little sense to read the second sentence as limiting the reach of such taxes, since, at this point within the structure of Section 19, utility property could not be taxed at all, only assessed. It is extremely improbable the voters intended to limit the extent of a tax that was not yet even permitted to exist, particularly when enacting a provision changing decades of tax law in which utilities were simply not subject to property taxes.

This interpretation of the structure of Section 19 is strengthened as one reads on. The second sentence does impose affirmative limits on the ability to tax utility companies, stating they will only be taxed to the same extent as other businesses. The second paragraph then allows the Legislature to tax other public utilities not specifically included in the language of Section 19, and the fourth paragraph permits delegation of certain responsibilities by the Board. Read in this manner, Section 19 first imposes a duty of assessment on the Board, then generally enables certain utility property to be taxed, then limits the extent of certain taxes actually imposed on utilities, and finally contains specific permissions for the Legislature to enact additional laws and the Board to delegate. This common-sense approach to the structure of Section 19 supports our interpretation that the language in dispute is intended to be enabling, not limiting.

Similarly, we observe, as did the *Santa Clara* court, that the relevant language of Section 19 "describes the extent to which the property shall be subject to taxation, rather than the extent to which it shall be taxed." (*Santa Clara*, *supra,* 87 Cal.App.5th at p. 366.) Stating certain property of certain utilities shall be "subject to taxation" generally enables the taxation of that property. It does not detail how that property will be taxed. Comparatively, saying property "shall be taxed" in a certain manner does prescribe how the property will be taxed.

The phrases "subject to taxation" and "taxed" were used distinctly in section 11, of article XIII of the California Constitution (Section 11) which was enacted alongside the non-substantive revisions to Section 19 in 1974. Section 11, subdivision (f) states, "[a]ny taxable interest of any character, other than a lease for agricultural purposes and an

13.

interest of a local government, in any land owned by a local government that is *subject to taxation* pursuant to Section 11(a) of this Article *shall be taxed* in the same manner as other taxable interests." (See *Santa Clara, supra,* 87 Cal.App.5th at pp. 366–367.) Section 11, subdivision (a) discusses whether certain lands and property were "taxable." (§ 11, subd. (a).) This indicates: (1) "subject to taxation" and "taxed" were intended to have different meanings, because the drafters knowingly used different words in different sections; and (2) "subject to taxation" is analogous to "taxable," which describes a general state of the property allowing it to be taxed, not the taxes or rates to which that property will actually be subject. There is no reason to believe this distinction is not also true in Section 19, the current language of which was reviewed at the same time as the language for Section 11. This, again, points toward the relevant language being enabling, not limiting.

Appellants' criticism that the *Santa Clara* court's conception of a space between the assessment and taxation stage as a "twilight stage of the ad valorem property tax system that nobody believes exists and in which nothing of legal consequence occurs" is not well-taken. There obviously is such a space between assessment and taxation, in which property is taxable, but not necessarily taxed. Section 19 does not itself impose a tax or require that one be imposed on utility property, but rather enables it to be taxed. Property "subject to taxation" is property which can be taxed. It does not mean it *is* taxed. Nothing about Section 19 *requires* counties to impose ad valorem property taxes, although the County did apparently impose such taxes in the relevant tax years at issue in this case. The legal consequence of certain property being subject to taxation is that relevant legislative bodies with taxing powers may thereafter impose taxes on that property. It makes perfect sense to include such enabling language when, prior to the enactment of Section 19, legislative bodies with taxing powers could not impose taxes on that property.

14.

Further, the original language of the provision supports our interpretation of this as an enabling clause, not a limiting clause. As our Supreme Court noted in *ITT*, Section 19, which was formerly section 14, was revised in 1974, but the changes were non-substantive in nature and thus the original language provides a relevant interpretive guide. (*ITT, supra,* 37 Cal.3d at p. 870, fn. 6.) After saying utility property would be "subject to taxation to the same extent and in the same manner," former section 14 contained the following language:

> "[Utility companies] herein mentioned and their franchises, other than insurance companies and their franchises, shall be taxed *in the same manner and at the same rates* as mercantile, manufacturing and business corporations and their franchises are taxed pursuant to section 16 of this article; provided, that nothing herein shall be construed to release any company mentioned in this section from the payment of any amount agreed to be paid or required by law to be paid for any special privilege or franchise granted by any political subdivision or municipality of this State; provided, further, that no excise or income tax or any other form of tax or license charge shall be levied or assessed upon or collected from the companies, or any of them, mentioned in the first paragraph of this section, in any manner or form, different from, or at a higher rate than that imposed upon or collected from mercantile, manufacturing and business corporations doing business within this State." (*Santa Clara, supra,* 87 Cal.App.5th at p. 367, italics added.)

This language clearly did require an equality of tax rates, but only between business taxes on utilities and other businesses, not between utility property and common property. (*Santa Clara, supra,* 87 Cal.App.5th at pp. 367–368.) The fact that former section 14 used the language "to the same extent and in the same manner" in reference to utility property tax, and the language "in the same manner and at the same rates" in reference to other taxes on utilities, shows that "the same extent" does not mean "at the same rates." (See *Digital Realty Trust, Inc. v. Somers* (2018) 583 U.S. 149, 161 [when language is included "in one section of a statute but omit[ted] in another," we presume the drafter "intended a difference in meaning"]; *Barron v. Superior Court* (2023) 90 Cal.App.5th 628, 638–639; *People v. McCallum* (2020) 55 Cal.App.5th 202, 212.) The

15.

language states only that utilities themselves must be subject to business taxes (such as sales or income taxes) at the same tax rates as other businesses. However, this limitation is clearly separate and distinct from a limitation on property tax rates. Thus, the original language of section 14 also supports the conclusion that current Section 19 does not impose a rate equivalence requirement between common property and utility property.

Appellants argue that section 1 of article XIII of the California Constitution (Section 1) generally requires uniformity and equality in taxation, and that this should serve to guide our interpretation of any ambiguity in Section 19.[8] Section 1 states "[u]nless otherwise provided by this Constitution or the laws of the United States: (a) All property is taxable and shall be assessed at the same percentage of fair market value." (§ 1.) While there is authority for the proposition that, generally speaking, taxation should be uniform, (*Crothers v. County of Santa Cruz* (1957) 151 Cal.App.2d 219, 224), appellants raise Section 1 merely as an interpretative aid, arguing that because there is a general statement in favor of some types of equality in taxation, we should interpret Section 19 as mandating utility property never be taxed at a higher rate than common property. However, this ignores the critical prefatory language in Section 1, which notes its requirements exist "[u]nless otherwise provided by this Constitution or the laws of the United States." (§ 1.) Such variations have occurred numerous times. For example, while Section 1 expressly requires fair market valuation, "Proposition 13 … changed the taxation of real property by replacing 'the fair market valuation standard with that of

---

[8]     Appellants do not argue in their opening brief, and did not allege in either their original or first amended complaint, that application of section 100 of the Revenue and Taxation Code violates Section 1 of the California Constitution. To the extent appellants attempt to raise such an argument for the first time in their reply brief, we reject it. (*In re Estate of Westerman* (1968) 68 Cal.2d 267, 279; *High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 111, fn. 2; *Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 583; *Transcontinental Insurance Co. v. Insurance Co. of the State of Pennsylvania* (2007) 148 Cal.App.4th 1296, 1309; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)

acquisition value.'" (*RAR2 Villa Marina Center CA SPE, Inc. v. County of Los Angeles* (2023) 91 Cal.App.5th 1050, 1063.)  We do not see Section 1 as a significantly helpful interpretive guide in analyzing the language of Section 19, because Section 1 is a catch-all that applies only when other provisions of the Constitution do not.  Also, for this reason, the general principle that we should attempt to harmonize constitutional provisions where possible plays no role.  (See *City & County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 563 [noting the duty to harmonize constitutional provisions is based on the avoidance of "the implied repeal of one provision by another," because "[i]mplied repeals are disfavored"].)  Because Section 1 specifically states it applies only when not "otherwise provided by this Constitution," there can be no disharmony between Section 1 and any other provision.  Ultimately, it provides no guidance as an interpretive aid.

Relying on the language, structure, and history of non-substantive changes to Section 19, we find the clause "[t]his property shall be subject to taxation to the same extent and in the same manner as other property" to be unambiguous.  This is an enabling clause that renders certain property of certain utilities, which previously could not be taxed, taxable in nature.  It does not limit the extent to which that property can be taxed.

The language, structure, and revisions to Section 19 resolve the question at issue here, and thus we have no need to reach into the history of Section 19's enactment.  *(John v. Superior Court* (2016) 63 Cal.4th 91, 95-96; *People v. LaDuke* (2018) 30 Cal.App.5th 95, 100.)  However, were we to do so, we would find the history of Section 19 also supports the conclusion that Section 19 was intended to enable the taxation of utility property, not to limit the rate at which it can be taxed.  When examining the legislative history of a measure submitted to the voters by ballot, "courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure."  (*People v. Superior Court (Pearson)* (2010) 48 Cal.4th 564, 571.)

17.

The ballot materials presented to the voters in 1933 included an argument in favor of Section 19, which stated California was in a "tax crisis," noting "[m]uch of the difficulty that now confronts us is the tremendous amount of frozen assets that can not be liquidated because of the terrific burden of unsound and confiscatory taxation." The argument explained: "Senate Constitutional Amendment Number 30 is a well considered revision of California's revenue system that is submitted to the voters of this State for the purpose of equalizing taxation and affording relief to taxpayers. Effective January 1, 1935, this plan provides for the repeal of the so-called Amendment No. 1 adopted in 1910. This will return $1,900,000,000 actual value of public utility property to the tax rolls for the support of local government." It noted also that the State would assume certain cost requirements, "thereby relieving local taxpayers to the extent of $37,000,000 annually." It then stated, "Vote YES on Number One on the ballot and save California's homes and farms from confiscatory taxation." No argument was apparently made against the initiative.

The actual ballots presented to the voters synopsized the measure as follows: "Commencing 1935 requires property of public utility companies assessed by State Board of Equalization and taxed locally for local purposes as other property, taxing their franchises and income for State purposes like business corporations." The text of the bill then followed, stating first that all utility property "shall be subject to taxation to the same extent and in the same manner as other property." It then continued in a separate paragraph, stating that utility companies—not utility property—"shall be taxed in the same manner and at the same rates as mercantile, manufacturing and business corporations and their franchises are taxed." Again, we note the distinction in language between "shall be subject to taxation" and "shall be taxed," the former being enabling language that generally permits the taxation of such property, the latter specifying how that general power shall be exercised. We also note the voters were first told that utility property would be subject to taxation in the same manner as was their common property,

18.

which had not been true for more than two decades. No express mention was made about the rates which would be imposed. The voters were then told separately that utilities were also to be taxed as business corporations, and that those taxes were required to have equivalent tax rates. Again, the inclusion of a rate equivalency requirement in one section that was pointedly omitted from the section immediately preceding it is good evidence the voters were not told about, and therefore did not intend to enact, property tax rate protectionism for the utility companies in this ballot measure. (See *Digital Realty Trust, Inc. v. Somers, supra*, 583 U.S. at p. 161; *Barron v. Superior Court, supra*, 90 Cal.App.5th at pp. 638–639; *People v. McCallum, supra,* 55 Cal.App.5th at p. 212.)

Appellants' arguments about the "unbroken public and governmental understanding" of Section 19 as instituting rate protections for utility companies are not persuasive. This section of appellants' brief quotes selectively from certain documents which have a tangential relation to the interpretive question before us. Appellants focus on certain reports and analyses that preceded the drafting of language by the Legislature which was ultimately put to the voters in the 1933 ballot initiative. However, these documents are of less importance in determining voter intent here, because there is no indication these documents were ever provided to the voters. While we presume the voters were aware of what the law was at the time a ballot measure is put forward, (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1048), we see no reason to presume they were aware of the various reports, drafts, or analyses that had circulated within the Legislature and various administrative agencies in the years preceding the measure. Because Section 19 was adopted by ballot measure, it is the intent and understanding of the voters that is key. (*People v. Rojas* (2023) 15 Cal.5th 561, 568; *Slaieh v. Superior Court* (2022) 77 Cal.App.5th 266, 273.) And while we may look to the "the contemporaneous construction of the Legislature or of the administrative agencies charged with implementing the new enactment" for interpretive guidance, (*Amador Valley Joint Union High School District v. State Board of Equalization, supra,*

19.

22 Cal.3d at p. 245), this typically considers implementing decisions occurring after the ballot measure passes. (See *id.* at p. 246 [discussing the implementation of article XIII A by the Legislature and agencies following its enactment].) Pre-existing documents which were never provided to the voters are of significantly less help in guiding our interpretation.

We also note these documents contain proposals that were never even attempted to be implemented in Section 19, again suggesting their utility is limited. For instance, the document entitled "Summary of a Plan for Revision of California's Revenue System to Effect a Reduction in Property Taxes and a Limitation on Governmental Expenditures," appears to be a general report and recommendation to the Legislature from Ray L. Riley, State Controller, and Fred E. Stewart, Director of the Tax Research Bureau and a member of the State Board of Equalization. However, among the proposals in that document was a gross receipts tax to be levied on all transactions in the state exceeding $250 per quarter. It noted the current plan "provided no exemption in this broad base," and included such transactions as "church receipts, endowments for colleges and other institutions," which would be subject to the proposed tax. However, it simultaneously noted "it would probably be against public policy to tax that character of gross receipts and obviously they would be exempted by the Legislature." There is no indication such a gross receipts tax made it into the ballot measure ultimately presented to the voters. Accordingly, it is fair to say this summary document, which was not drafted by the Legislature, was not intended to be put forth as a piece of legislation, but rather contained ideas the Legislature may or may not wish to put to the voters. Further, there is no indication this summary was included in the information sent to voters at the time of Section 19's adoption. Its relevance to interpreting what the voters understood Section 19 to mean is therefore tangential at best.

The same is largely true of the legislative analysis compiled prior to the Legislature's decision to submit it to the voters, entitled "A Plan for Tax Relief,"

published by the Special Legislative Joint Tax Committee.  Moreover, even this document does not portray the picture painted by appellants—that the issue of foremost concern was that utility property taxes never exceed those of common property.  This document noted the committee was appointed to consider "tax problems and plans for balancing the budget," and concluded the Legislature should propose an amendment to the People providing "[t]he restoration to the local tax rolls of public utility property of the value and excess of $1,338,000,000."  It further noted, "[b]ecause of the difficulties involved in changing from one tax system to another, it is deemed desirable to defer the operative date [of this enactment] for two years, and to require the public utilities to pay additional taxes during that period, for maintaining the State Government."  The document further stated, "[t]ax relief to common property owners, particularly farmers, is the main purpose" of the proposed amendment.  Continuing in greater detail, the analysis stated that it would abandon "the present separation of sources of State and local revenues by returning utility property to the local tax rolls to be taxed in the same way that other property is taxed, thereby broadening the local tax base by one-sixth, with corresponding tax reduction for the common property owner."

The analysis described the background of the issue as follows:  "Equalization of tax burdens as between utility property … and common property … has been a source of constant controversy.  Studies have been made to determine tax burdens in terms of actual value of property imposed on these two classes of taxpayers.  Legislation to adjust gross receipts rates accordingly has been bitterly opposed by the utility interests.  Dissatisfaction with the system seems to have become general."  It also noted that "[o]ne of the most serious criticisms of the general property tax as enforced prior to 1910 was that utility property could not be adequately valued under the existing administrative provisions.  Save with reference to the road bed, rails, right of way, rolling stock and franchises of railroads operating in more than one county, all utility property was valued

21.

by local assessors, who had no means of securing complete data regarding such large holdings."

The committee's report does not suggest this tax reform plan was intended to guarantee utilities would never pay a property tax rate higher than other taxpayers. Instead, it suggests tax relief to the common taxpayer was of primary importance, with paramount importance placed upon relief to farmers. It recommended pursuing this even though this approach would "require the public utilities to pay additional taxes" for a period of two years. Further, the obvious widespread public opinion was that utilities paid too little in taxes, which was confirmed by appellants at oral argument: references to "equalizing" tax rates clearly meant taxing utilities more heavily, not ensuring their tax rates never exceeded those of common taxpayers. (*ITT*, *supra*, 37 Cal.3d at pp. 862–863.) Thus, even if we were to give this document the weight appellants' briefing seeks, it would not prove the point appellants seek to prove.

Finally, the out-of-state authorities to which appellants cite are not persuasive, primarily because they concern statutes with dramatically different language and structures. (See *Board of Supervisors of Harrison County v. Gulf Coast Military Academy* (Miss. 1921) 89 So. 617, 617–618*; Robertson v. K.C. Lumber Co.* (Miss. 1918) 77 So. 246, 247–248; *Land Title Bank & Trust Co. v. Ward* (E.D.Pa. 1937) 20 F.Supp. 810, 813; *First National Bank of Birmingham v. Department of Revenue* (Fla.Ct.App. 1978) 364 So. 2d 38, 40.) Were we reviewing a different statute with a different structure and different language, our conclusion would undoubtedly change.

In sum, we have reviewed appellants' historical materials, and do not find an "unbroken" line of agreement that Section 19 was intended to institute tax rate protectionism for utility property. Instead, the documents depict concern that utilities paid too little in taxes, while common taxpayers paid too much, and that changes to the manner in which utilities were taxed were necessary to force utilities to pay more. Unsurprisingly, this parallels the synopsis of our Supreme Court in describing the

background of Section 19 in *ITT*.  (*ITT, supra*, 37 Cal.3d at pp. 862–863.)  This historical information, combined with our interpretation of the language, structure, and context of Section 19, confirms that the phrase "[t]his property shall be subject to taxation to the same extent and in the same manner as other property" is an enabling clause, making the utility property in question taxable.  It was not intended as a limiting clause, preventing utility property from ever being taxed at a rate higher than common property.

We note appellants' policy arguments against what they allege is the "undemocratic" and disproportionate taxing of utilities.  In our form of democracy, however, these populist arguments are best addressed to the Legislature, which is empowered to make such policy decisions.

## DISPOSITION

Given the foregoing, the judgment below is affirmed.  Respondents shall recover their costs on appeal.

FRANSON, ACTING P. J.

**WE CONCUR:**

MEEHAN, J.

DESANTOS, J.

23.

Filed 3/17/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| PACIFIC BELL TELEPHONE COMPANY et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>COUNTY OF MERCED et al.,<br><br>    Defendants and Respondents. | F087825<br><br>(Super. Ct. No. 23CV-02355)<br><br><br>**ORDER GRANTING REQUEST FOR PUBLICATION AND DENYING REHEARING** |

As the nonpublished opinion filed on February 24, 2025, and the modification filed on February 25, 2025, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.

Appellant's petition for rehearing filed on March 12, 2025, is hereby denied.

FRANSON, ACTING P. J.

WE CONCUR:

MEEHAN, J.

DESANTOS, J.